FILED
United States Court of Appeals
Tenth Circuit

March 29, 2021

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENST CIRCUIT

---

LEVI FRASIER,

    Plaintiff - Appellee,

v.

Denver Police Officers
CHRISTOPHER L. EVANS, #05151;
CHARLES C. JONES, #04120; JOHN H.
BAUER, #970321; RUSSELL
BOTHWELL, #94015; JOHN
ROBLEDO,

    Defendants - Appellants,

-------------------------------------------------

THE RUTHERFORD INSTITUTE;
FIRST AMENDMENT LEGAL
SCHOLARS; CATO INSTITUTE;
AMERICAN CIVIL LIBERTIES
UNION; AMERICAN CIVIL
LIBERTIES UNION FOUNDATION OF
COLORADO; INSTITUTE FOR
JUSTICE; ELECTRONIC FRONTIER
FOUNDATION; NATIONAL POLICE
ACCOUNTABILITY PROJECT; THE
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS;
AMERICAN SOCIETY OF NEWS
EDITORS; THE ASSOCIATED PRESS
MEDIA EDITORS; ASSOCIATION OF
ALTERNATIVE NEWSMEDIA;
BOSTON GLOBE MEDIA PARTNERS,
LLC; CALIFORNIA NEWS

No. 19-1015

PUBLISHERS ASSOCIATION; CALIFORNIANS AWARE; THE COLORADO BROADCASTERS ASSOCIATION; THE COLORADO FREEDOM OF INFORMATION COALITION; THE COLORADO INDEPENDENT; THE COLORADO PRESS ASSOCIATION; THE COLORADO SUN; DIGITAL FIRST MEDIA, LLC; THE E.W. SCRIPPS COMPANY; FIRST AMENDMENT COALITION; FIRST LOOK MEDIA WORKS, INC.; FREEDOM OF THE PRESS FOUNDATION; GANNETT CO., INC.; THE INTERNATIONAL DOCUMENTARY ASSOCIATION; THE INVESTIGATIVE REPORTING PROGRAM; THE INVESTIGATIVE REPORTING WORKSHOP; THE MCCLATCHY COMPANY; THE MEDIA INSTITUTE; MPA – THE ASSOCIATION OF MAGAZINE MEDIA; THE NATIONAL FREEDOM OF INFORMATION COALITION; THE NATIONAL PRESS CLUB; THE NATIONAL PRESS CLUB JOURNALISM INSTITUTE; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; THE NEW YORK TIMES COMPANY; NEWS MEDIA ALLIANCE; ONLINE NEWS ASSOCIATION; RADIO TELEVISION DIGITAL NEWS ASSOCIATION; REPORTERS WITHOUT BORDERS; REUTERS; THE SOCIETY OF ENVIRONMENTAL JOURNALISTS; SOCIETY OF PROFESSIONAL JOURNALISTS; TEGNA INC.; THE TULLY CENTER

2

FOR FREE SPEECH; VICE MEDIA
LLC,

     Amici Curiae.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-01759-REB-KLM)**

---

David C. Cooperstein, Assistant City Attorney, (Jamesy C. Trautman, Assistant City Attorney, with him on the briefs), Denver City Attorney's Office, Denver, Colorado, for Defendants-Appellants.

Elizabeth Wang, of Loevy & Loevy, Boulder, Colorado, for Plaintiff-Appellee.

Matthew R. Cushing, Adjunct Faculty, University of Colorado Law School, Boulder, Colorado, filed an amicus curiae brief for First Amendment Legal Scholars in support of Plaintiff-Appellee.

Mark Silverstein and Sara R. Neel, of American Civil Liberties Union and American Civil Liberties Union Foundation of Colorado, Denver, Colorado; and Anya Bidwell, of Institute for Justice, Austin, Texas; and Jay R. Schweikert and Clark M. Neily, III, of CATO Institute, Washington, D.C., filed an amici curiae brief for American Civil Liberties Union and American Civil Liberties Union of Colorado, Institute for Justice, CATO Institute, in support of Plaintiff-Appellee.

Sophia Cope and Adam Schwartz, of Electronic Frontier Foundation, San Francisco, California, filed an amicus curiae brief for Electronic Frontier Foundation in support of Plaintiff-Appellee.

David Milton, Boston, Massachusetts; Eugene Iredale, Julia Yoo, and Grace Jun, of Iredale and Yoo, APC, San Diego, California, filed an amicus curiae brief for National Police Accountability Project in support of Plaintiff-Appellee.

Christopher F. Moriarty, John W. Whitehead, and Douglas R. McKusick, of The Rutherford Institute, Charlottesville, Virginia, filed an amicus curiae brief for The Rutherford Institute in support of the Plaintiff-Appellee.

3

Steven D. Zansberg, of Ballard Spahr, LLP., Denver, Colorado, filed an amicus curiae brief of The Reporters Committee for Freedom of the Press and 38 media organizations in support of Plaintiff-Appellee.

---

Before **HOLMES, KELLY**, and **BACHARACH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

After Plaintiff-Appellee Levi Frasier video-recorded Denver police officers using force while arresting an uncooperative suspect in public, one of the officers followed Mr. Frasier to his car and asked him to provide a statement on what he had seen and to turn over his video of the arrest. Mr. Frasier at first denied having filmed the arrest but ultimately showed the officer the tablet computer on which he had video-recorded it. He did so after an officer, Defendant-Appellant Christopher L. Evans, and four other members of the Denver Police Department, Officer Charles C. Jones, Detective John H. Bauer, Sergeant Russell Bothwell, and Officer John Robledo—the other Defendants-Appellants—surrounded him and allegedly pressured him to comply with their demand to turn over the video. Mr. Frasier contends that when he showed Officer Evans the tablet computer, the officer grabbed it from his hands and searched it for the video without his consent. Mr. Frasier has sued the five officers under 42 U.S.C. § 1983, claiming they violated and conspired to violate his constitutional rights under both the First and Fourth Amendments. The officers moved the district court for summary

judgment on qualified-immunity grounds, and the court granted them qualified immunity on some of Mr. Frasier's claims but denied it to them on others.

The district court, as relevant here, held that Officer Evans had reasonable suspicion to detain Mr. Frasier throughout their twenty-three-minute encounter because Mr. Frasier lied to him about filming the arrest, thereby potentially violating Colorado Revised Statutes § 18-8-111, which proscribes knowingly making certain false statements to the police. The court, therefore, granted Officer Evans qualified immunity on Mr. Frasier's claim that the officer illegally detained him in violation of the Fourth Amendment, and Mr. Frasier did not oppose granting summary judgment to the other officers on this claim. Officer Evans did not move for summary judgment on Mr. Frasier's claim that he illegally searched Mr. Frasier's tablet computer in violation of the Fourth Amendment, but the other officers did. The court granted them summary judgment because the record did not support a finding that they personally participated in the alleged search.

The district court, however, denied the officers qualified immunity on Mr. Frasier's First Amendment retaliation claim even though it had concluded that Mr. Frasier did not have a clearly established right to film a public arrest. The court held that the record nonetheless supported a finding that the officers actually knew from their training that people have a First Amendment right to

record them in public. And the court ruled that officers are not entitled to qualified immunity when they knowingly violate a plaintiff's rights. The court also denied the officers qualified immunity on Mr. Frasier's civil-conspiracy claims on the ground that the record supported a finding that the officers, in surrounding him and allegedly demanding the video from him, had agreed to force him to submit his tablet computer to a search in violation of his First and Fourth Amendment rights. The officers now timely appeal from the district court's partial denial of qualified immunity. Exercising jurisdiction under 28 U.S.C. § 1291, we **reverse**.

**I**

**A**

We begin by setting forth the district court's findings of the facts that are supported by the summary-judgment record, when viewed in the light most favorable to Mr. Frasier, the non-movant. *See Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018) (observing that when "[w]e review the district court's denial of summary judgment on qualified immunity," we "apply[] the same standard as the district court" and, thus, "view[] the evidence . . . in the light most favorable to the non-moving party"); *accord Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1169 (10th Cir. 2020). We do so because "[t]he district court's factual findings and reasonable assumptions comprise the universe of facts

3

upon which we base our legal review of whether defendants are entitled to qualified immunity." *Sawyers v. Norton*, 962 F.3d 1270, 1281 (10th Cir. 2020) (quoting *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015)).

When the district court "concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Sawyers*, 962 F.3d at 1281 (quoting *Est. of Booker v. Gomez*, 745 F.3d 405, 409–10 (10th Cir. 2014)); *see Johnson v. Jones*, 515 U.S. 304, 313 (1995) (stating that we generally lack jurisdiction to hear an interlocutory challenge to "a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial"). With those limitations on the scope of our factual review in mind, we now turn to the facts that the district court found apply to the officers' motions for qualified immunity at summary judgment.[1]

On August 14, 2014, Detective Bauer of the Denver Police Department saw a silver car participate in a drug deal in a public parking lot in Denver, Colorado.

---

[1]     In recounting the relevant facts here, we rely upon the factual recitation of the district court in its order denying defendants' motion for partial summary judgment. *See* Aplts.' App. at 1011–17 (Order Re: Defs.' Mot. for Partial Summ. J., filed Nov. 21, 2018).

4

He radioed for backup and followed the car to another public parking lot, where he approached the car, announced he was the police, and ordered the car's driver to show his hands. When the suspect did not obey the detective's order, the detective pulled him from his car and pinned him against it. At that point, Sergeant Bothwell arrived on scene to assist the detective.

The suspect removed a sock from his waistband and stuffed it in his mouth. The officers thought the sock contained contraband and ordered the suspect to "spit it out," but he refused to do so. The officers fell to the ground with the suspect as they tried to remove the sock from his mouth. Mr. Frasier stood nearby in the parking lot, and Detective Bauer asked him for help. After confirming that Detective Bauer was a police officer, Mr. Frasier agreed to help and briefly grabbed the sock. Before Mr. Frasier could assist the officers to a significant degree, however, other uniformed officers started showing up and Sergeant Bothwell asked Mr. Frasier to step back, which he did. Mr. Frasier moved about ten feet away and started video-recording the event using his tablet computer.

Officers Evans and Jones arrived on scene and joined in the effort to subdue the resisting suspect, who continued to refuse to release the sock from his mouth. Mr. Frasier's video captured Officer Jones hitting the suspect in the face six times in rapid succession. And he filmed the officers' response to a screaming woman who approached them as they continued to struggle on the

5

ground with the suspect: Officer Jones pushed her away, and then Officer Evans grabbed her ankle and pulled her off of her feet. As the suspect finally let go of the sock, Sergeant Bothwell called out "Camera."

Once the officers handcuffed the suspect, Mr. Frasier stopped filming and returned to his parked vehicle. He hid his tablet computer because he thought that he had captured police misconduct and was afraid that the officers might try to make his video "disappear." Officer Evans followed Mr. Frasier to his parked vehicle and asked him to bring his identification and the video of the arrest to the officer's patrol car. Mr. Frasier brought his driver's license, but not his tablet computer containing the video, to the patrol car.

Officer Evans told Mr. Frasier that he needed a witness statement from him. When he asked Mr. Frasier whether he had video of the arrest, Mr. Frasier claimed that he did not. Then, Officer Evans pointed to the back seat of his patrol car and told Mr. Frasier, "Well, we could do this the easy way or we could do this the hard way." Mr. Frasier thought that Officer Evans was threatening to take him to jail if he did not produce the video. The officer handed Mr. Frasier a witness statement form, which he proceeded to fill out. After Mr. Frasier provided a skeletal written account of what he had seen (one that omitted the officers' use of force against the suspect and the screaming woman), Officer Evans wrote a series of questions on the form that he then had Mr. Frasier answer.

6

The questions concerned whether Mr. Frasier observed "the officers do anything inappropriate" or use any force after "they had the suspect in custody," and whether he had taken (and still had) any "video footage of the incident." Mr. Frasier responded in writing that he did not see any inappropriate police conduct, that the officers stopped using force as soon as they had the suspect in custody, and that he took only a Snapchat photo of the arrest, which he no longer had a copy of because "Snapchat removes [footage] as soon as you send [it]." Mr. Frasier's answers were all lies; he admitted that he lied on the police form because he was afraid that if he told the truth he "would have been incarcerated and the video that [he] took would be taken away."

After Mr. Frasier completed his written witness statement, an unidentified officer asked him where his video of the arrest was. When he again denied having taken a video, the unidentified officer said, "We saw you videotaping it." Officer Evans asked Mr. Frasier to get his cell phone, but when he retrieved it from his parked vehicle, another unidentified officer asserted, "That's not it." Mr. Frasier falsely contended that he had nothing else.

Officer Evans and Sergeant Bothwell approached Mr. Frasier, and shortly thereafter Detective Bauer and Officer Robledo did as well. The four officers initially faced Mr. Frasier from his right, but then Officer Jones approached and stood behind Mr. Frasier to his left. Detective Bauer then changed positions and

7

moved behind Mr. Frasier as well, which led to Mr. Frasier being "encircled" by the five officers "for a moment." The officers "stood in close proximity to Mr. Frasier," who said that they "repeatedly demanded [the tablet computer he had used to record the video], telling him they 'needed to have it' and that it would be in the 'best interest of the Denver Police Department and everyone involved' for Mr. Frasier to provide the video." Mr. Frasier could not identify which officer or officers made these statements. He vigorously shook his head but ultimately acquiesced because he believed that it was "very clear" that if he did not produce his tablet computer, he was "going to jail."

Mr. Frasier retrieved his tablet computer and showed it to Officer Evans. He and Officer Evans "ducked behind the open hatchback of a nearby SUV," where they "were mostly hidden from view." Officer Evans grabbed the tablet computer out of Mr. Frasier's hands and began to search for the video of the arrest, asking him where it was. Mr. Frasier told Officer Evans that he could not search his computer without a warrant, but Officer Evans held onto it for thirty to forty-five seconds. While searching through it, Officer Evans called back over his shoulder, "I don't see the video in here. I can't find it." An unidentified officer responded, "As long as there's no video, it's okay." Officer Evans then handed the tablet back to Mr. Frasier.

Officer Evans stepped out from behind the SUV and briefly conferred with Sergeant Bothwell and two other officers. Officer Evans showed them Mr. Frasier's written witness statement, and they reviewed it. Officer Evans then moved again behind the SUV where Mr. Frasier had remained. Officer Evans asked him if he had anything else to say, and Mr. Frasier asked to leave. The officer then handed back Mr. Frasier's driver's license, thanked him, and shook his hand. Mr. Frasier then left, approximately twenty-three minutes after Officer Evans first approached him.

When Mr. Frasier later tried to locate his video of the arrest on his tablet computer, he could not find it and publicly claimed that Officer Evans had deleted it. The Denver Police Department's Internal Affairs Bureau then subjected Mr. Frasier's tablet computer to a forensic analysis, which "revealed the video was still present on the device and had never been deleted."

**B**

On August 14, 2015, Mr. Frasier commenced this civil action by filing a complaint against Officer Evans, Officer Jones, Detective Bauer, and Sergeant Bothwell, as well as the City and County of Denver, Colorado. He amended his complaint twice, and his second amended complaint—which now is the operative complaint—added Officer Robledo as a fifth individual defendant. Mr. Frasier claimed, as relevant here, that the individual defendants had retaliated against him

9

for filming the suspect's arrest in violation of the First Amendment, that they had detained him and searched his tablet computer in violation of the Fourth Amendment, that they had conspired to commit the above constitutional violations, and that the municipality of Denver was liable for the officers' First Amendment violations due to its failure to train them about the public's First Amendment rights.

The officers successfully moved the district court to dismiss Mr. Frasier's First Amendment claim on the ground that they all were entitled to qualified immunity because his right to record them in the performance of their official duties in public spaces was not clearly established at the time of their alleged conduct in August 2014.

The municipality of Denver later moved the district court for summary judgment on Mr. Frasier's First Amendment claim and presented evidence that the Denver Police Department had been training its officers since February 2007 that the public has the right to record them performing their official duties in public spaces and that each of the officers in this case had "testified unequivocally that, as of [August 2014], they were aware that members of the public had the right to record [them]." Aplts.' App. at 200 (Defs.' Mot. for Partial Summ. J., filed July 30, 2018). The district court granted summary judgment to the municipality, holding that "it is plain the [municipality] had in place, at the time of the events

10

giving rise to this lawsuit, an official policy which clearly affirmed citizens' First Amendment rights to record the police in the public discharge of their official duties." *Id*. at 1032 (Order Re: Defs.' Mot. for Partial Summ. J., filed Nov. 21, 2018). The court further held that the record did not support a finding that the municipality had failed to train its officers adequately in its official policy. The court noted in particular that "all the defendant officers in this case . . . testified they understood at the time of their encounter with Mr. Frasier that citizens had the right to record them." *Id*. at 1033–34. The court, having granted summary judgment to the municipality, dismissed it from the action.

The district court later concluded that it had erred in granting the officers qualified immunity on Mr. Frasier's First Amendment claim. Although the court still held that the right to record police officers performing their official duties in public spaces was not clearly established in August 2014, the court determined that the record supported a finding that in August 2014 the officers nonetheless actually knew, based on their training, that the right existed. The court reasoned that "[i]f an official can be held accountable for what he is *presumed* to know" because it is clearly established law, "it is neither illogical nor unfair to hold him accountable for what he admits he *actually* knows." *Id*. at 1041–42 (Order Granting Pl.'s Mot. to Reconsider, filed Nov. 21, 2018). The court, moreover, cited Justice Brennan's brief concurrence in *Harlow v. Fitzgerald*, 457 U.S. 800

11

(1982), for the proposition that although the qualified-immunity doctrine focuses on the objective legal reasonableness of an official's conduct, it does "not allow the official who *actually knows* that he was violating the law to escape liability for his actions, even if he could not 'reasonably have been expected' to know what he actually did know." *Id.* at 1041 (quoting *Harlow*, 457 U.S. at 821 (Brennan, J., concurring)). The court, therefore, reconsidered its dismissal of Mr. Frasier's First Amendment claim and reinstated it.

The officers then moved the district court for summary judgment on Mr. Frasier's reinstated First Amendment claim, arguing that they were entitled to qualified immunity because Mr. Frasier's First Amendment right to record them performing their official duties in public spaces (a right, the existence of which, they did not challenge) was not clearly established in August 2014 by judicial precedent. The district court denied their motion for qualified immunity, holding that the record supported a finding that they had retaliated against Mr. Frasier because of his filming of the suspect's arrest—which was a First Amendment protected activity—and that they were liable for their retaliation because of their "actual knowledge that Mr. Frasier had a First Amendment right to record them in the public execution of their official duties." *Id.* at 1128 (Order Denying Defs.' Mot. for Summ. J. on Pl.'s First Amendment Retaliation Claim, filed Jan. 11, 2019).

12

The officers also moved the district court for summary judgment on most of Mr. Frasier's Fourth Amendment claims. Although they did not pursue summary judgment on the claim that Officer Evans had unlawfully searched Mr. Frasier's tablet computer, they contended that the record did not support a finding that the other officers personally participated in Officer Evans's alleged search. They also argued that insofar as they detained Mr. Frasier after the suspect's arrest, they were justified in doing so because they reasonably suspected that he had violated Colorado Revised Statutes § 18-8-111 by providing false information to them regarding whether he had filmed the arrest. Mr. Frasier did not oppose granting summary judgment on his Fourth Amendment detention claim to Officer Jones, Detective Bauer, Sergeant Bothwell, and Officer Robledo, so the court entered judgment for them on that claim without discussion. The court then granted those four officers qualified immunity on Mr. Frasier's search-related claim because the record did not support a finding that they had personally participated in Officer Evans's alleged search of the tablet computer. The court also granted Officer Evans qualified immunity on Mr. Frasier's detention-related claim, holding that the officer had reasonable suspicion that Mr. Frasier had violated Colorado Revised Statutes § 18-8-111 by making false statements to the police.

13

Finally, the officers moved the district court for summary judgment on Mr. Frasier's conspiracy claim. They raised "the defense of qualified immunity" against the claim and asserted the record was "devoid of evidence to demonstrate that [a conspiracy existed]." *Id*. at 217. The district court granted the officers summary judgment on the claim insofar as it was predicated on the notion that they had illegally detained Mr. Frasier because the court had found "no Fourth Amendment violation with respect to the putative seizure of Mr. Frasier." *Id*. at 1028.

The court decided, however, that there were "genuine disputes of material fact as to whether the officer defendants came to an agreement which ultimately led to Officer Evans's alleged illegal search of the tablet [computer]." *Id.* at 1029. The court held that "Mr. Frasier's testimony," when "coupled with" the officers' "presen[ce]" at the "heated discussion . . . , after which Mr. Frasier conceded to the[ir] demands," "could support a reasonable conclusion that together, the officer defendants agreed . . . to force Mr. Frasier to submit the tablet [computer] to a search." *Id*. The court further held that it was "not fatal to [his conspiracy] claim that Mr. Frasier cannot identify which officer said what to him" during the "heated discussion." *Id*. The court, thus, denied summary judgment to the officers insofar as the claim referred to a conspiracy to unlawfully search the tablet computer—apparently construing such a conspiracy

14

as violating both his First Amendment right to be free from retaliation for protected speech and his Fourth Amendment right to be free from an unreasonable search.

The officers timely filed a notice of interlocutory appeal from the district court's orders partially denying their qualified-immunity defense. We now **reverse**.

## II

We begin by reviewing the district court's denial of qualified immunity to the officers on Mr. Frasier's First Amendment retaliation claim. The court held that, although Mr. Frasier's alleged right to record the officers performing their official duties in public spaces was not clearly established at the time of the underlying events in August 2014, the officers nevertheless were not entitled to qualified immunity because the record supported a finding that the officers actually knew from their training that the right existed. *Id.* at 1039–44, 1128. "[W]e review the district court's denial of a summary judgment motion asserting qualified immunity de novo." *Sawyers*, 962 F.3d at 1282 (quoting *Fancher v. Barrientos*, 723 F.3d 1191, 1199 (10th Cir. 2013)); *accord Corona v. Aguilar*, 959 F.3d 1278, 1282 (10th Cir. 2020); *Halley*, 902 F.3d at 1143.

## A

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, ---- U.S. ----, 139 S. Ct. 500, 503 (2019) (per curiam) (quoting *Kisela v. Hughes*, 584 U.S. ----, 138 S. Ct. 1148, 1152 (2018) (per curiam)); *accord Cox v. Wilson*, 971 F.3d 1159, 1171 (10th Cir. 2020). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that *every* 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *accord Dist. of Columbia v. Wesby*, ---- U.S. ----, 138 S. Ct. 577, 589 (2018); *Cox*, 971 F.3d at 1171; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.").

Ordinarily, "[t]o make such a showing [of clearly established law] in our circuit, 'the plaintiff must point to a Supreme Court or Tenth Circuit decision on

16

point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Cox*, 971 F.3d at 1171 (quoting *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1027 (10th Cir. 2015)); *accord Singh v. Cordle*, 936 F.3d 1022, 1033–34 (10th Cir. 2019). Typically, the precedent must have clearly established the right "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, ---- U.S. ----, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Brosseau*, 543 U.S. at 198); *accord Cox*, 971 F.3d at 1171; *see also White v. Pauly*, ---- U.S. ----, 137 S. Ct. 548, 552 (2017) (noting that the Supreme Court has repeatedly highlighted "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality'" (quoting *a1-Kidd*, 563 U.S. at 742)).

That said, "[w]e do not require a case directly on point, but existing precedent [nonetheless] must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see Anderson*, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (citations omitted)). In this regard, the Supreme Court has reminded us recently that under certain "extreme circumstances" general constitutional principles established in the caselaw may give reasonable government officials fair warning that their

17

conduct is constitutionally or statutorily unlawful.  *See Taylor v. Riojas*, ---- U.S. ----, 141 S. Ct. 52, 53 (2020) (per curiam) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

## B

The officer defendants challenge the district court's denial of their qualified-immunity defense with respect to Mr. Frasier's First Amendment retaliation claim.  They contend that the court should have granted them immunity once it held that judicial precedent did not clearly establish in August 2014 Mr. Frasier's alleged First Amendment right to record them performing their official duties in public spaces.  We agree.

More specifically, the district court erred in concluding that the officers were not entitled to qualified immunity because they actually knew from their training that such a First Amendment right purportedly existed—even though the court had determined that they did not violate any clearly established right.  There are two salient, independent grounds for concluding that the district court's ruling was wrong.  First, and perhaps most significantly, a defendant's eligibility for qualified immunity is judged by an objective standard and, therefore, what the officer defendants subjectively understood or believed the law to be was irrelevant with respect to the clearly-established-law question.  Second, judicial decisions are the only valid interpretive source of the content of clearly

18

established law, and, consequently, whatever training the officers received concerning the nature of Mr. Frasier's First Amendment rights was irrelevant to the clearly-established-law inquiry.

As to the first point, we long ago explained in *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642 (10th Cir. 1988), the standard for qualified immunity is wholly objective:

> An assertion of qualified immunity is properly evaluated under the standard enunciated by the Supreme Court in *Harlow v. Fitzgerald* . . . . Before *Harlow*, qualified immunity contained both an objective and a subjective component. Because of its subjective component, qualified immunity was often ineffective in resolving insubstantial suits against government officials before trial. In an attempt to balance the need to preserve an avenue for vindication of constitutional rights with the desire to shield public officials from undue interference in the performance of their duties as a result of baseless claims, the Court adopted an objective test to determine whether the doctrine of qualified immunity applies. When government officials are performing discretionary functions, they will not be held liable for their conduct unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known."

*Id.* at 645 (citations omitted) (quoting *Harlow*, 457 U.S. at 818); *see also Mitchell v. Forsyth*, 472 U.S. 511, 517, 524 (1985) (stating that in *Harlow* the Supreme Court "purged qualified immunity doctrine of its subjective components" and that under *Harlow* an official is "entitled to immunity so long as his actions do not violate 'clearly established statutory or constitutional rights of which a reasonable

19

person would have known'" (quoting *Harlow*, 457 U.S. at 818)); *Breidenbach v. Bolish*, 126 F.3d 1288, 1292 (10th Cir. 1997) ("When the Supreme Court reformulated its qualified immunity test in *Harlow* to focus on the 'objective reasonableness' of an officer's actions as opposed to his or her subjective intent, the Court sought to shield government officials not only from the 'substantial costs' of subjecting officials to the risks of trial, but also from '[j]udicial inquiry into subjective motivation,' including 'broad-ranging discovery and the deposing of numerous persons.'" (quoting *Harlow*, 457 U.S. at 816)).

As the Supreme Court observed in *Harlow* itself, its qualified-immunity test focuses "on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, [to] avoid excessive disruption of government and [to] permit the resolution of many insubstantial claims on summary judgment." 457 U.S. at 818. The Court further observed that "[i]f the law at th[e] time [the official acted] was not clearly established, [he] could not reasonably . . . be said to 'know' that the law forbade [his] conduct." *Id*.

Moreover, the Court subsequently clarified in *Anderson* that, whether an official is entitled to qualified immunity under the *Harlow* standard does not turn on whether he "subjective[ly] belie[ved]" his conduct was lawful, but, rather, on whether "he could, as a matter of law, reasonably have believed that [his conduct] was lawful . . . in light of the clearly established principles governing [it]."

20

*Anderson*, 483 U.S. at 641; *accord Grant v. City of Pittsburgh*, 98 F.3d 116, 123 (3d Cir. 1996) ("*Harlow* teaches that whether the [defendant officers] in fact knew that they were violating plaintiffs' constitutional rights is simply irrelevant to [the qualified-immunity] analysis."); *id.* at 123–24 ("It is now widely understood that a public official who knows he or she is violating the constitution nevertheless will be shielded by qualified immunity if a 'reasonable public official' would not have known that his or her actions violated clearly established law."). Thus, as *Anderson* makes clear, under *Harlow*, an officer's "subjective beliefs about [whether his conduct was lawful] are irrelevant." *Anderson*, 483 U.S. at 641.

As applied here, it is therefore "irrelevant" whether each officer defendant actually believed—or even in some sense knew—that his conduct violated a statutory or constitutional right—more specifically, the First Amendment. *Id.*; *accord Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (stating that, before *Harlow* it was relevant to qualified immunity "if [a defendant] did not actually know his conduct was unconstitutional," and that "*Harlow* eliminated any consideration of the defendant's intent as it relates to his knowledge of the law" (citing *Halperin v. Kissinger*, 807 F.2d 180, 186 (D.C. Cir. 1986) (per Scalia, J.)); *see also Halperin*, 807 F.2d at 186 ("It is clear from the Court's [*Harlow*] opinion that the qualified immunity defense is not to be denied because the defendant

21

official in fact knew (even though most people would not) that his action was categorically unlawful . . . .").  The district court therefore erred in denying the officer defendants qualified immunity regarding Mr. Frasier's First Amendment retaliation claim based on their subjective knowledge of Mr. Frasier's purported First Amendment right to record them on the public street performing their duties.

Mr. Frasier contends nonetheless that the district court was right to deny the officers their defense because qualified immunity does not protect those who "knowingly violate the law."  Aplee.'s Resp. Br. at 29 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also id*. at 30 ("This is a straightforward, albeit rare, case in which Defendants are not entitled to qualified immunity because they knew what the law required.").  He further contends that we and other circuits have recognized that an officer does not warrant immunity under *Harlow* when he actually knew that he was violating the law, irrespective of whether the law was clearly established at the time.  *Id*. at 32.  Like the district court, Mr. Frasier locates the origin of this somewhat novel interpretation of *Harlow* in Justice Brennan's concurrence in that case.  *Id*. at 34 ("[The *Harlow*] standard would not allow the official who *actually knows* that he was violating the law to escape liability for his actions, even if he could not 'reasonably have been expected' to know what he actually did know." (quoting *Harlow*, 457 U.S. at 821 (Brennan, J., concurring))).

22

We, however, reject the idea that *Harlow* permits an exception to its objective standard based on an official's subjective understanding or knowledge of the law. We note that "a concurring opinion is not binding on us"—even one from a Supreme Court Justice—and, therefore, such an opinion is relevant only insofar as its analysis is "persuasive." *United States v. Garcia*, 877 F.3d 944, 950 n.4 (10th Cir. 2017); *see United States v. Thompson*, 866 F.3d 1149, 1159 (10th Cir. 2017) (declining to follow a concurrence in a Supreme Court case because it was "not the opinion of the Court"), *vacated on other grounds*, 138 S. Ct. 2706 (2018). And Justice Brennan's concurrence is not a persuasive reading of the scope of *Harlow*'s holding. *See Anderson*, 483 U.S. at 641; *see also Grant*, 98 F.3d at 123 ("*Harlow* teaches that whether the [officers] in fact knew that they were violating plaintiffs' constitutional rights is simply irrelevant to [its qualified-immunity] analysis."); *Halperin*, 807 F.2d at 186 ("It is clear from the Court's [*Harlow*] opinion that the qualified immunity defense is not to be denied because the defendant official in fact knew (even though most people would not) that his action was categorically unlawful . . . .").

Mr. Frasier tells us that we—as well as other federal courts of appeals—have already adopted Justice Brennan's *Harlow* concurrence. In this connection, he particularly cites to *Pleasant v. Lovell*, 876 F.2d 787 (10th Cir. 1989), asserting that we "specifically stated [in that case] that a 'government

23

official who actually knows that he is violating the law is not entitled to qualified immunity even if [his] actions [are] objectively reasonable.'" Aplee.'s Resp. Br. at 31–32 (second and third alterations in original) (quoting *Pleasant*, 876 F.2d at 798).

Although Mr. Frasier is correct that we used that language in *Pleasant*, he neglects to mention that it only appears in a parenthetical purporting to describe the holding of Justice Brennan's *Harlow* concurrence. *See Pleasant*, 876 F.3d at 798. And *Pleasant*'s reference to Justice Brennan's *Harlow* concurrence only appears in a brief aside that can only be read as dictum. That is because the panel already had announced its determinative conclusion that the defendants were not entitled to qualified immunity assessing their conduct through *Harlow*'s objective prism.[2] *See id*. Therefore, Mr. Frasier's reliance on *Pleasant* is misguided.

---

[2] The contested issue in *Pleasant* was whether three officials were entitled to qualified immunity for their conduct in using an organization's clerk to help them inspect and acquire copies of the organization's materials without a warrant. *See* 876 F.3d at 790–92, 796. We reasoned that "[t]he variety of the information obtained on this fishing expedition, the degree of supervision by the defendants, and the sheer number of contacts between [the clerk] and [the] defendants . . . belie the notion that [the clerk] merely was acting as a responsible citizen," as opposed to a government agent. *Id*.; *see also id.* at 795–96 (holding that it was "clearly established law [at the time of the underlying conduct] that the fourth amendment proscribed unreasonable searches and seizures by government agents"). And we thus held that the officials were not eligible for immunity because reasonable officials "could [not] have believed that their receipt of documents from [the organization's clerk] was lawful" under the Fourth

(continued...)

24

Furthermore, we also decline to follow the out-of-circuit caselaw that Mr. Frasier offers to us. Irrespective of whether he has accurately cited those decisions as supporting his argument that an official cannot receive qualified immunity when he actually knows he violated the law, we do not believe that those cases can cast any doubt on our baseline conclusion—firmly grounded in Supreme Court precedent—that qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which *a reasonable person* would have known." *City of Escondido*, 139 S. Ct. at 503 (emphasis added) (quoting *Kisela*, 138 S. Ct. at 1152); *see Anderson*, 483 U.S. at 641; *see also Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013) ("Under the qualified-immunity doctrine a public officer . . . is subject

---

²(...continued)
Amendment. *Id.* at 798. After announcing this determinative holding, applying an objective lens, we noted as an aside (in a sentence introduced by the modifier, "[m]oreover") that a taped conversation in the record supported a finding that "the defendants actually knew that [the clerk] was acting as a government agent." *Id.* at 798. We cannot read this stray sentence as anything more than dictum. The *Pleasant* panel already had concluded that the defendants were not entitled to qualified immunity when the conduct was viewed through *Harlow*'s objective prism. There was nothing more essential to say on this subject. *See, e.g.*, *Cent. Green Co. v. United States*, 531 U.S. 425, 431 (2001) (stating that a "sentence was unquestionably dictum because it was not essential to our disposition of any of the issues [in the case]"). Accordingly, we are free to—and do—eschew *Pleasant*'s dictum here. *See United States v. Finnesy*, 953 F.3d 675, 700 (10th Cir. 2020) (noting we are "not bound by a prior panel's dicta" (quoting *Bates v. Dep't of Corr.*, 81 F.3d 1008, 1011 (10th Cir. 1996))); *accord United States v. Titties*, 852 F.3d 1257, 1273 (10th Cir. 2017).

to liability only for violating a federal constitutional or statutory right that was clearly established at the time of the violation.").[3]

As for the second point, the district court was wrong to deny the officers qualified immunity based on their knowledge of Mr. Frasier's purported First Amendment rights that they gained from their training. Judicial decisions are the only valid interpretive source of the content of clearly established law; whatever training the officers received concerning the First Amendment was irrelevant to the clearly-established-law inquiry. *See Wesby*, 138 S. Ct. at 589 ("To be clearly established, a legal principle must have a sufficiently clear foundation in *then-existing precedent*." (emphasis added)); *accord Ullery v. Bradley*, 949 F.3d

---

[3]    We note that virtually all of the out-of-circuit cases that Mr. Frasier cites are from the early- to mid-1980s—*i.e.*, the years immediately following the Supreme Court's 1982 *Harlow* ruling, which, departing from the well-trodden path, "purged qualified immunity doctrine of its subjective components." *Mitchell*, 472 U.S. at 517. The only case he cites that is not from the 1980s is an unpublished decision from 1991. Aplee.'s Resp. Br. at 32 (citing *Russo v. Massullo*, Nos. 90-3240 & 90-3241, 1991 WL 27420, at *7 (6th Cir. Mar. 5, 1991) (unpublished) (per curiam)). We find it telling that Mr. Frasier can find no more recent decision to support his interpretation of *Harlow*. As the Third Circuit observed back in 1996, "It is now widely understood that a public official who knows he or she is violating the constitution nevertheless will be shielded by qualified immunity if a 'reasonable public official' would not have known his or her actions violated clearly established law." *Grant*, 98 F.3d at 123–24; *see Bruning*, 949 F.2d at 356 (stating that, before *Harlow*, it was relevant "if [a defendant] did not actually know his conduct was unconstitutional" and that "*Harlow* eliminated any consideration of the defendant's intent as it relates to his knowledge of the law").

1282, 1291 (10th Cir. 2020); *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1218 (10th Cir. 2019); *see also United States v. Nixon*, 418 U.S. 683, 703 (1974) (stating that "each branch of the Government must initially interpret the Constitution, and [each branch's] interpretation . . . is due great respect," but it is "'emphatically the province and duty of the judicial department to say what the law is'" (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803))); *cf. NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (noting that "it is the 'duty of the judicial department'—in a separation-of-powers case as in any other—'to say what the law is,' . . . . [b]ut it is equally true that the longstanding 'practice of the government,' can inform our determination of 'what the law is'" (quoting *Marbury*, 5 U.S. at 177, then *McCulloch v. Maryland*, 316 (4 Wheat) 316, 401 (1819)). Indeed, it is beyond peradventure that judicial decisions concretely and authoritatively define the boundaries of permissible conduct in a way that government-employer training never can. Thus, irrespective of the merits of the training that the officer defendants received concerning the First Amendment, it was irrelevant to the clearly-established-law inquiry here. The district court consequently erred in denying the officers qualified immunity based on the actual knowledge that they purportedly gained from such non-judicial sources.

In conclusion, we hold that the district court applied an erroneous rationale in denying the officer defendants qualified immunity on Mr. Frasier's First

27

Amendment retaliation claim. If the officers did not violate Mr. Frasier's clearly established First Amendment rights—and the district court itself said they did not—then the officers are entitled to qualified immunity. This is so, even if the officers subjectively knew—based on their training or from municipal policies—that their conduct violated Mr. Frasier's First Amendment rights.

## C

Mr. Frasier contends that we should nevertheless affirm the district court's judgment denying qualified immunity to the officers on the alternative ground that his First Amendment right to record the officers performing their official duties in public spaces was actually clearly established in August 2014, even though the district court ruled to the contrary. An appellee "is generally permitted to defend the judgment won below on any ground supported by the record without filing a cross appeal." *Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1240 (10th Cir. 2013) (quoting *Wyoming v. USDA*, 661 F.3d 1209, 1254 n.33 (10th Cir. 2011)). He may do so even if, as here, his argument involves "an attack upon the reasoning of the lower court." *Jennings v. Stephens*, 574 U.S. 271, 276 (2015) (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924)). Not surprisingly, the officers argue to the contrary: specifically, that Mr. Frasier's purported First Amendment right to record them

28

was not clearly established in August 2014, and, therefore, Mr. Frasier cannot defeat their claim to qualified immunity. We agree with the officers.[4]

"Whether a constitutional right is clearly established is a question of law which we review *de novo*." *Pyle v. Woods*, 874 F.3d 1257, 1263 (10th Cir. 2017). "A defendant's motion for summary judgment based on qualified immunity

---

[4] We do not consider, nor opine on, whether Mr. Frasier actually had a First Amendment right to record the police performing their official duties in public spaces. *See Cox*, 971 F.3d at 1171 (observing in a qualified-immunity case that we have discretion to bypass whether the defendant violated a right and to resolve the case instead on the ground that "the plaintiff fail[ed] to show [the] right was clearly established" (quoting *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016))); *accord Culver v. Armstrong*, 832 F.3d 1213, 1217 (10th Cir. 2016). We exercise our discretion to bypass the constitutional question of whether such right even exists. In doing so, we are influenced by the fact that neither party disputed that such a right exists (nor did the district court question its existence). *See, e.g.*, Aplts.' App. at 174 (Order Re: Objs. to Recommendation, filed Sept. 28, 2017) ("Defendants do not object to the magistrate judge's determination that there exists a First Amendment right to record the police performing their official duties in a public forum . . . ."). Yet, our "adversarial system of justice . . . . is premised on the well-tested principle that truth . . . is 'best discovered by powerful statements on both sides of the question.'" *Penson v. Ohio*, 488 U.S. 75, 84 (1988) (quoting Irving Kaufman, *Does the Judge Have a Right to Qualified Counsel?*, 61 A.B.A. J. 569, 569 (1975)); *see Kaley v. United States*, 571 U.S. 320, 338 (2014) (recognizing the "generally sound premise" that "the adversarial process leads to better, more accurate decision-making"). And because we ultimately determine that any First Amendment right that Mr. Frasier had to record the officers was not clearly established at the time he did so, we see no reason to risk the possibility of "glibly announc[ing] new constitutional rights in dictum that will have no effect whatsoever on the case." Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. REV. 1249, 1277 (2006). We nonetheless thank *amici* for their helpful briefing on the issue of whether the right exists.

29

imposes on the plaintiff 'the burden of showing . . . that the constitutional right [the defendant allegedly violated] was clearly established at the time of the violation.'" *Burke v. Regalado*, 935 F.3d 960, 1002 (10th Cir. 2019) (quoting *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877 (10th Cir. 2014)). We "apply[] the same standard as the district court." *Storey v. Taylor*, 696 F.3d 987, 992 (10th Cir. 2012).

Mr. Frasier does not assert that any on-point Tenth Circuit authority provided clearly established law in August 2014 concerning his First Amendment retaliation claim, and we are not aware of any. Yet, Mr. Frasier argues that his right to record the police performing their official duties in public spaces was clearly established by two "general constitutional rule[s] already identified in the decisional law." Aplee.'s Resp. Br. at 38 (quoting *Hope*, 536 U.S. at 741). He points in particular to two principles: (1) "the creation and dissemination of information are speech within the meaning of the First Amendment," and (2) "[n]ews gathering is an activity protected by the First Amendment." *Id*. at 39 (first quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011), then *Journal Publ'g Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986)); *see also id.* at 43 (maintaining that because "[t]he general constitutional rule protecting speech creation and newsgathering applied with obvious clarity to Plaintiff," such that "[e]very reasonable official in Defendants' position in 2014 would have

30

understood that harassing and retaliating against Plaintiff for recording them arresting [the suspect] violated Plaintiff's First Amendment rights"). We find unpersuasive, however, Mr. Frasier's effort to show that these general principles clearly established a First Amendment right applicable to these circumstances, which involve the recording of police officers performing their official duties in public spaces.

The Supreme Court has "repeatedly stressed that courts must *not* 'define clearly established law at a high level of generality, since doing so avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 138 S. Ct. at 590 (emphasis added) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)); *see also Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017) ("This [controlling] precedent cannot define the right at a high level of generality. Rather, the precedent must be particularized to the facts." (citation omitted)). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* (alteration in original) (quoting *Anderson*, 483 U.S. at 641); *see also White*, 137 S. Ct. at 552 (explaining it is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality'" but must instead "be 'particularized' to the facts of the case" to prevent turning "the rule of qualified immunity . . . into a rule of

31

virtually unqualified liability simply by alleging violation of extremely abstract rights" (omission in original) (first quoting *al-Kidd*, 563 U.S. at 742, then *Anderson*, 483 U.S. at 639)). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that *every* reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590 (emphasis added); *see also Hope*, 536 U.S. at 731 (noting that "the salient question . . . is whether the state of the law . . . gave [the defendants] fair warning that [their] alleged treatment of [the plaintiff] was unconstitutional").

Mr. Frasier's attempt to distill a clearly established right applicable here from the general First Amendment principles protecting the creation of speech and the gathering of news runs headfirst into the Supreme Court's prohibition against defining clearly established rights at a high level of generality. Mr. Frasier fails to demonstrate how the alleged unlawfulness of the officers' conduct in retaliating against him for recording them "follow[s] immediately from" the abstract right to create speech and gather news. *See Wesby*, 138 S. Ct. at 590 (quoting *Anderson*, 483 U.S. at 641).

Furthermore, to the extent that Mr. Frasier relatedly asserts—referencing *Hope v. Pelzer* and its progeny—that these general constitutional principles apply to these facts "with obvious clarity," 536 U.S. at 741, such that reasonable

32

officers in the defendants' positions would have known that their conduct was unlawful, his suggestion falls far from the mark. That is because *Hope*'s holding historically has been applied to only the "rare 'obvious case,'" *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau*, 543 U.S. at 199), involving "extreme circumstances," *Taylor*, 141 S. Ct. at 53, or "particularly egregious" misconduct, *id*. at 53. *See Ullery*, 949 F.3d at 1291 ("[W]hen a public official's conduct is so egregious even a general precedent applies with 'obvious clarity,' the right can be clearly established notwithstanding the absence of binding authority involving materially similar facts." (quoting *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017))).

Even a cursory consideration of these facts—in the light of cases like *Taylor* and *Hope*—makes clear that this is not such a rare case. *Compare also A.N. ex rel. Ponder v. Syling*, 928 F.3d 1191, 1198 (10th Cir. 2019) ("We agree with the district court that the clearly established rule prohibiting intentional, arbitrary and unequal treatment of similarly situated individuals under the law applies with obvious clarity to Defendants' alleged actions and policy of discriminating between A.N. and other sixteen- and seventeen-year-old juvenile arrestees and younger juvenile arrestees in complying with New Mexico's laws prohibiting the public disclosure of juvenile arrest and delinquency information."), *with Doe v. Woodard*, 912 F.3d 1278, 1299 (10th Cir. 2019)

33

(rejecting plaintiffs' argument, based in part on *Hope*'s holding, that "this is the rare alleged violation of minimal Fourth Amendment standards that is so 'obvious' that a factually similar case is unnecessary for the clearly established law standard"). Indeed, the Fifth Circuit, for example, has already rejected the argument that one can derive the right to "video record[] the police" from "general First Amendment principles." *Turner v. Driver*, 848 F.3d 678, 686 (5th Cir. 2017). Thus, we cannot conclude that such general First Amendment principles protecting the creation of speech and the gathering of news could provide clearly established law under these particular factual circumstances—that is, these principles would not have put the unconstitutionality of the officers' allegedly retaliatory conduct "beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *accord Apodaca*, 864 F.3d at 1076.

Mr. Frasier argues next that even if "the well-established First Amendment protection provided to speech creation and newsgathering were too general to apply with obvious clarity to Defendants' conduct, the weight of authority from other Circuits clearly established [his] First Amendment right to record the Defendants." Aplee.'s Resp. Br. at 43–44. He directs our attention in particular to four pre-August 2014 circuit court decisions: *ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Smith v.*

34

*City of Cumming*, 212 F.3d 1332 (11th Cir. 2000); and *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995).

Even if we assume that all four decisions—*i.e.*, *Alvarez*, *Glik*, *Smith*, and *Fordyce*—clearly stand for the proposition that there is a First Amendment right to record the police performing their duties in public spaces,[5] those decisions do not indicate that this right was clearly established law in our circuit in August 2014. "If judges [] disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). And circuit judges have disagreed regarding whether this purported First Amendment right to record was clearly established around August 2014. *Cf. Alvarez*, 679 F.3d at 601 & n.10 (describing in 2012 a "circuit split" on whether "the right to record the police was clearly established"). *Compare Glik,* 655 F.3d at 83, 85 (holding that "even if these cases [two out-of-circuit court of appeals decisions, one unpublished per curiam and one published] were to establish a circuit split," the law was "clearly established" in the First Circuit by October 2007 that "the First Amendment protects the filming of government officials in public spaces"), *with Fields v. City of Philadelphia*, 862

---

    5    Though *Alvarez*, *Smith*, and *Fordyce* all involved First Amendment § 1983 claims arising from the recording of law enforcement conduct in public spaces, none of them, for various reasons, opined on the question of whether the alleged First Amendment right at issue was clearly established law. *See Alvarez*, 679 F.3d at 601 & n.10; *Smith*, 212 F.3d at 1333; *Fordyce*, 55 F.3d at 439.

F.3d 353, 362 (3d Cir. 2017) ("[W]e cannot say that the state of the law at the time of our cases (2012 and 2013) gave fair warning so that every reasonable officer knew that, absent some sort of expressive intent, recording public police activity was constitutionally protected."), *Turner*, 848 F.3d at 687 ("In light of the absence of controlling authority and the dearth of even persuasive authority, there was no clearly established First Amendment right to record the police at the time of [the plaintiff's] activities" in September 2015), *and Kelly v. Borough of Carlisle*, 622 F.3d 248, 261–62 (3d Cir. 2010) (observing that *Fordyce* recognized "a general right to record matters of public concern . . . . only in passing," and "conclud[ing] there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' [in May 2007] that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment").[6]

---

[6] Furthermore, "an unpublished opinion can be quite relevant in showing that the law was *not* clearly established." *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018); *accord Ullery*, 949 F.3d at 1294. And, in a roughly analogous context, we have drawn attention to our unpublished decision in *McCormick v. City of Lawrence*, 130 F. App'x 987, 988–89 (10th Cir. 2005) (unpublished)—which addressed related conduct occurring in 2002—and held that "it was not clearly established that police violated the First Amendment by destroying recordings of police activity at roadside sobriety checkpoints." *Mocek v. City of Albuquerque*, 813 F.3d 912, 930 (10th Cir. 2015).

In other words, the out-of-circuit authorities appear to be split on the clearly-established-law question. And, in the teeth of this circuit split, we could not reasonably conclude that the "clearly established weight of authority from other courts" has "found the law to be as [Mr. Frasier] maintains.'" *Cox*, 971 F.3d at 1171 (quoting *Callahan*, 806 F.3d at 1027); *see Mocek v. City of Albuquerque*, 813 F.3d 912, 929 n.9 (10th Cir. 2015) ("A circuit split will not satisfy the clearly established prong of qualified immunity."); *accord Lincoln v. Maketa*, 880 F.3d 533, 539 (10th Cir. 2018) (indicating that the contention that the law was clearly established was undermined by the fact that the views of out-of-circuit authorities concerning the point of law were "not universal"). And, more specifically, the out-of-circuit authorities that Mr. Frasier cites do not convince us that, in August 2014, reasonable officers in the positions of the officer defendants here would have had "fair notice that [their] conduct was unlawful." *Brosseau*, 543 U.S. at 198; *accord Hope*, 536 U.S. at 741.

* * *

In conclusion, we hold that the district court erred in denying the officers qualified immunity with respect to Mr. Frasier's First Amendment retaliation claim. Irrespective of whether the officers subjectively knew from their training that Mr. Frasier possessed a First Amendment right to record them performing their official duties in public spaces, this right (which we assume to exist) was not

37

clearly established law in August 2014 when they allegedly retaliated against Mr. Frasier for recording them. Accordingly, Mr. Frasier has not shouldered his burden on the second prong of the qualified-immunity standard (the clearly-established-law prong), and the officers are therefore entitled to judgment in their favor on this claim.

## III

Finally, we consider the officers' challenge to the district court's denial of qualified immunity to them on Mr. Frasier's conspiracy claim. Because we have concluded that the officers are entitled to qualified immunity on Mr. Frasier's First Amendment retaliation claim based on the absence of clearly established law, it necessarily follows that they also are entitled to qualified immunity on his conspiracy claim insofar as it alleges a conspiracy to retaliate against him in violation of the same First Amendment right. Stated otherwise, because the law was not clearly established in August 2014 that it was unlawful under the First Amendment to retaliate against Mr. Frasier for recording the officers carrying out their official duties in public spaces, it ineluctably follows that the law was not clearly established that it was unlawful to conspire to engage in the same retaliation.

More specifically, there was no clearly established law that the alleged object of the officers' conspiracy was actually unconstitutional under the First

38

Amendment, and, consequently, the officers are entitled to qualified immunity for any such conspiracy. *See Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990) (providing that an actionable conspiracy under § 1983 must involve an unlawful scheme or plan); *cf. Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1231 (10th Cir. 2020) ("For a valid § 1983 conspiracy claim, plaintiffs 'must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient.'" (quoting *Snell*, 920 F.2d at 701)); *see also Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010) ("A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right."); *accord Mitchell v. City of Moore*, 218 F.3d 1190, 1198 (10th Cir. 2000).

Thus, the only aspect of Mr. Frasier's § 1983 civil-conspiracy claim that remains is the officers' alleged conspiracy to unlawfully search his tablet computer in violation of the Fourth Amendment.

**A**

**1**

To prove a conspiracy under § 1983, a plaintiff must show "at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general

39

conspiratorial objective." *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010). And "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants. 'Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim.'" *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (citation omitted) (quoting *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994)); *accord Brooks*, 614 F.3d at 1228.

We have helpfully elaborated on the nature of a conspiracy claim in *Snell*:

> A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "exact limits of the illegal plan or the identity of all the participants therein." An express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was "a single plan, the essential nature and general scope of which [was] know[n] to each person who is to be held responsible for its consequences."

920 F.2d at 702 (first alteration in original) (citations omitted) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980)).

As evident from this quoted passage of *Snell*, to be actionable, the defendants must have actually formed an agreement—even though it need not be express. Therefore, proof that defendants engaged in "[p]arallel action . . . does

40

not necessarily indicate an agreement to act in concert." *Brooks*, 614 F.3d at 1228 (alteration in original) (quoting *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004)). Furthermore, it is also evident from *Snell*'s quoted language that the agreement must be illegal. In the § 1983 context, that means the agreement must relate to "some deprivation of a federally protected right." *Mitchell*, 218 F.3d at 1198; *accord Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990). Therefore, proof that defendants formed an agreement or conspired to engage in lawful activities—including lawful investigative activities—would be inadequate to support a § 1983 conspiracy claim. *See Grider*, 618 F.3d at 1260 (deeming inadequate showing in § 1983 claim that law-enforcement officers unlawfully conspired to falsely charge the individual plaintiff with bribery, where "[a]t best" the evidence showed that the officers "assisted" another officer in a criminal investigation, "which is lawful and part of their duties as law enforcement officers" and "is a far cry from showing that [the officers] agreed to fabricate, and then maliciously prosecute [the plaintiff] for, a bribery crime he did not commit").

## 2

The district court only briefly commented on the merits (as relevant here) of the Fourth Amendment conspiracy claim regarding the search of Mr. Frasier's

41

tablet computer before denying qualified immunity to the officers. The sum total

of its reasoning directly related to this issue is the following:

> Mr. Frasier has adduced evidence sufficient to create genuine disputes of material fact as to whether the officer defendants came to an agreement which ultimately led to Officer Evans's alleged illegal search of the tablet [computer]. The HALO video[7] shows the officers surrounding Mr. Frasier. It appears obvious from the video (or at least a reasonable jury could conclude, even without sound) that a heated discussion took place, after which Mr. Frasier conceded to the officers' demands.

> It is not fatal to this claim that Mr. Frasier cannot identify which officer said what to him. All were present for this encounter, and coupled with Mr. Frasier's testimony, the evidence, if credited by the jury, could support a reasonable conclusion that together, the officer defendants agreed, whether expressly or tacitly, to force Mr. Frasier to submit the tablet [computer] to a search.

Aplts.' App. at 1029. Thus, the district court concluded that Mr. Frasier had

satisfied his burden to show that each of the officer defendants conspired to

unlawfully search his tablet computer in violation of his Fourth Amendment

rights—thereby clearing the first (constitutional-violation) hurdle of the qualified-

immunity standard. And, because the district court found that the officers did

"not argue the law was not clearly established as to this alleged violation of Mr.

Frasier's constitutional rights"—that is, the second, clearly-established-law hurdle

---

[7] The district court did not explain what "HALO video" is, but this video is apparently captured by a type of "surveillance camera[]" that the Denver police use. Aplts.' App. at 190 n.6.

42

under the qualified-immunity standard—the court concluded that Mr. Frasier had satisfied fully his qualified-immunity burden, and the officers were not entitled to summary judgment. *Id*. at 1029 n.17.

## B

The officer defendants vigorously contend that the district court's order denying them qualified immunity on Mr. Frasier's Fourth Amendment conspiracy claim is erroneous—both because the court's factual findings allegedly are not sufficient to support a legal conclusion that they conspired to violate Mr. Frasier's Fourth Amendment rights by unlawfully searching his tablet computer and because any Fourth Amendment rights that Mr. Frasier possessed to be free from such a conspiracy were not clearly established in August 2014 under the particular facts of this case.

We set forth the officers' arguments—in their own words—in greater detail than might otherwise be customary because their words are relevant to the threshold challenges that Mr. Frasier mounts almost single-mindedly in his effort to uphold the district court's judgment. As to whether the district court erred in concluding that they violated Mr. Frasier's Fourth Amendment rights through a civil conspiracy, in pertinent part, the officers aver the following:

43

The district court [] erred in denying qualified immunity to the Officers on Mr. Frasier's conspiracy claims because the findings made by the court are incapable of satisfying the elements of a civil conspiracy. The court's findings do not suffice to show that the Officers' mere presence at the group conversation was an act taken in concert for the purpose of depriving Mr. Frasier of his . . . Fourth Amendment rights. . . . The fact that each Officer approached the conversation, and remained there for approximately 30 seconds is, in and of itself, nothing more than conscious parallel conduct, which is insufficient to show that each Officer acted in concert with one another within the meaning of a conspiracy claim. . . .

The Officers' lack of shared knowledge also precludes a finding that there was any conspiratorial meeting of the minds preceding the group conversation. To the extent that the district court identified any shared objective amongst the Officers, it was to investigate the crimes committed by [the arrested suspect] and ascertain the existence of the recording, which Mr. Frasier had falsely denied possessing. . . . The only alleged unlawful aspect of any of the Officers' conduct is that Officer Evans later grabbed the tablet [computer] from Mr. Frasier's hands without his permission. However, the district court did not find any facts indicating that the other Officers were even aware of the alleged search/seizure of the tablet [computer], let alone that such was undertaken as part of an agreement between them. The district court's failure to identify any shared conspiratorial objective amongst the Officers in connection with the "heated discussion," beyond a desire to conduct a lawful criminal investigation, precludes the finding of a conspiracy.

Aplts.' Opening Br. at 47–49.

Regarding whether any Fourth Amendment rights of Mr. Frasier to be free from a conspiracy to search his tablet computer were clearly established in August 2014, the officers argued to the contrary. At the outset, they dispute the district

44

court's assertion that they failed to make a clearly-established-law argument and thus forfeited it, noting that they raised this issue in their summary-judgment briefing. *Id*. at 40 n.13. As to the merits, in relevant part, the officers argue the following:

> In this case, neither the district court, nor Plaintiff, identified authority clearly establishing that any reasonable officer in the Officers' position would have understood that what he was doing constituted a conspiracy in violation of Mr. Frasier's . . . Fourth Amendment rights. The court premised its denial of qualified immunity on the portion of the HALO video which depicted a "heated discussion" between Mr. Frasier and the Officers after which Mr. Frasier purportedly conceded to the Officers' requests by retrieving his tablet with the video recording. . . .

> However, the court also found that it was entirely lawful for Officer Evans to question Mr. Frasier, request that he provide his recording, and then detain him after Mr. Frasier falsely denied possessing the recording in violation of Colorado law. . . . [And] [t]he court did not find evidence that there was any discussion amongst the Officers regarding the search prior to it taking place. The only instance identified by the district court where Officers Evans and another one of the Officers conversed outside of Mr. Frasier's presence was *after* the alleged search. . . .

> The district court's analysis also fails to take into account the scienter component of a conspiracy claim. Specifically, the court made no effort to differentiate the Officers' lawful objectives to investigate and document the crimes committed by [the arrested suspect] and, subsequently Mr. Frasier—in providing deliberately false information—from their allegedly unlawful objective of conducting a warrantless search of the tablet [computer].

*Id.* 41–43.[8]

Confronted by the officers' relatively extensive merits arguments—concerning whether there were sufficient facts in the summary-judgment record to support the district court's determination that the officers violated Mr. Frasier's Fourth Amendment rights by conspiring to unlawfully search his tablet computer, and, if so, whether any such Fourth Amendment rights were clearly established in August 2014—Mr. Frasier almost single-mindedly presents certain threshold, non-merits arguments in his effort to uphold the district court's judgment. As we detail below, these arguments relate to whether we have jurisdiction to hear the officers' merits arguments, and, if so, whether certain of those arguments are forfeited. We conclude that Mr. Frasier's threshold, non-merits arguments are misguided and unsound; accordingly, they do not preclude us from reaching the merits. And, as to the merits, we determine that Mr. Frasier's arguments are woefully deficient. Consequently, he cannot

---

[8] Despite our holding to the contrary in *Brever v. Rockwell International Corporation*, 40 F.3d 1119, 1126–27 (10th Cir. 1994), the officers also argue that there was "uncertainty in the law regarding the intracorporate-conspiracy doctrine['s]" applicability in the context of civil-rights claims. Aplts.' Opening Br. at 45–46. Supposedly, this uncertainty "indicates that it was not clearly established that it is even possible for the Officers to have formed a civil conspiracy because they were all employed by the same legal entity, the City and County of Denver." *Id*. at 46. In light of our approach to resolving this appeal, we had no occasion to consider this contention further.

succeed in upholding the district court's order denying qualified immunity to the officers on Mr. Frasier's Fourth Amendment conspiracy claim.

## C

We turn now to address Mr. Frasier's threshold, non-merits arguments. Mr. Frasier effectively bets the proverbial farm on the belief that these arguments will prevail—giving, at best, short shrift to his merits arguments. But he loses this bet.

## 1

Mr. Frasier argues that "this Court lacks jurisdiction to review Defendants' qualified-immunity argument on Plaintiff's claim that Defendants conspired to illegally search his tablet [computer] under the Fourth Amendment." Aplee.'s Resp. Br. at 62. Mr. Frasier appears to reason as follows: (1) the officers "never argued [before the district court] they are entitled to qualified immunity on [Mr. Frasier]'s claim that they conspired to violate his Fourth Amendment rights"—and more specifically, the officers were "arguing only sufficiency of [the] evidence"; (2) "[b]ecause [the officers] did not argue this [qualified-immunity defense], the district court found the argument forfeited," and (3) because there was no qualified-immunity argument before it, "the district court's ruling was not an implicit rejection of qualified immunity." *Id*. at 61. Accordingly, reasons Mr. Frasier, because the district court did not deny the officers qualified immunity as

to his Fourth Amendment conspiracy claim, we do not have interlocutory appellate jurisdiction over the officers' qualified-immunity argument as to that claim.

Mr. Frasier's argument is fundamentally mistaken concerning the state of the record. First, in their motion for partial summary judgment, the officers expressly asserted that they were "entitled to summary judgment on [Mr. Frasier's] conspiracy claims" because he was "unable to overcome the defense of qualified immunity." Aplts.' App. at 217. They further maintained that there was "no evidence of a constitutional violation by [them]" and that the record was "devoid of evidence to demonstrate that two or more of [them] acted in concert to deprive Mr. Frasier of his constitutional rights or that a meeting of the minds by [them] to do so existed." *Id*. Thus, the officers expressly invoked the qualified-immunity defense.

Insofar as Mr. Frasier suggests that the officers' contention that the record lacked sufficient evidence to establish a constitutional violation is not a qualified-immunity argument, he is misguided. Arguing that "discovery fail[ed] to uncover evidence sufficient to create a genuine issue whether the defendant committed [a constitutional] violation" is a typical qualified-immunity argument. *Johnson v. Fankell*, 520 U.S. 911, 915 (1997); *see Est. of Smart*, 951 F.3d at 1169 (explaining that a defendant is entitled to qualified immunity at summary

48

judgment if the plaintiff cannot establish that "a reasonable jury could find facts supporting a violation of a constitutional right" (quoting *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016))). Moreover, the officers expressly raised their qualified-immunity defense with respect to the Fourth Amendment conspiracy claim when they asserted in their partial summary-judgment motion that they were "entitled to summary judgment on [the] conspiracy claims" because Mr. Frasier was "unable to overcome the defense of qualified immunity." Aplts.' App. at 217.

Furthermore, the district court's comments regarding forfeiture did not relate to the officers' qualified-immunity defense per se but, instead, to the officers' ostensible forfeiture of an argument with respect to the clearly-established-law component of the qualified-immunity standard. *See id*. at 1029 n.17 (noting, in discussing the Fourth Amendment conspiracy claim, that the officers "do not argue the law was not clearly established as to this alleged violation of Mr. Frasier's constitutional rights, and I therefore infer they . . . have forfeited any such argument"). And thus the district court's remarks about the officers' forfeiture did not amount to a statement—which would have been mistaken—that the officers did not assert a qualified-immunity defense with respect to the Fourth Amendment conspiracy claim.

49

And we have no need to scrutinize the district court's order on the officers' motion for partial summary judgment to see whether it constituted "an *implicit* rejection of qualified immunity," Aplee.'s Resp. Br. at 61 (emphasis added), as to Mr. Frasier's Fourth Amendment conspiracy claim. That is because the district court, in fact, *expressly* rejected the officers' qualified-immunity defense. *See* Aplts.' App. at 1035 ("[T]he motion is denied with respect to Mr. Frasier's claim for civil conspiracy against defendants . . . insofar as that claim is premised on the allegedly illegal search of Mr. Frasier's tablet [computer]."); *id*. at 1070 (Order Granting Defs.' Unopposed Mot. for Extension of Time to File Notice of Appeal, filed Dec. 13, 2018) (stating that the court "denied, in part, defendants' motion seeking qualified immunity as to some of plaintiff's constitutional claims," which included Mr. Frasier's Fourth Amendment conspiracy claim, and "[t]hat order constitutes an immediately appealable final order").

Accordingly, for the foregoing reasons, Mr. Frasier's jurisdictional challenge is mistaken concerning the state of the record and otherwise without merit. *Cf. Cox*, 800 F.3d at 1243–44 (concluding that we had jurisdiction "over [the defendant's] interlocutory appeal from the denial of qualified immunity," when "the court did explicitly deny [the defendant] *all* relief in its order, and part of the relief that [the defendant] unquestionably sought in his summary-judgment briefing was qualified immunity").

50

## 2

Even if we have jurisdiction over the officers' qualified-immunity appeal as to his Fourth Amendment conspiracy claim, Mr. Frasier appears to argue that the officers have "forfeited" any arguments pertaining to the clearly-established-law component of the summary-judgment standard—that is, forfeited any argument that "the law was not clearly established in August 2014" when they allegedly conspired to violate Mr. Frasier's Fourth Amendment rights. Aplee.'s Resp. Br. at 61–62. In this connection, Mr. Frasier points out that the district court itself said that the officers "d[id] not argue the law was not clearly established as to this alleged [conspiracy] violation of Mr. Frasier's [Fourth Amendment] constitutional rights" and, consequently, they "forfeited any such argument." Aplts.' App. at 1029 n.17; *see* Aplee.'s Resp. Br. at 61 (noting that "the district court found the argument forfeited").

However, like *Cox*, even if we were to assume that the officers were "obliged to marshal particularized arguments in support of the clearly-established-law question" and therefore forfeited such arguments by not making them before the district court, we would "exercise . . . our discretion to overlook the assumed forfeiture" on these facts and "elect here to reach the merits of [the officers'] qualified-immunity arguments based on the absence of clearly established law." *Id.* at 1245–46; *see, e.g.*, *Abernathy v. Wandes*, 713 F.3d 538,

51

552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary.").

Indeed, the argument here is even stronger than it was in *Cox* for exercising such discretion because—even though it was his burden to do so—Mr. Frasier did not even go as far as the *Cox* plaintiff: she at least made "feeble efforts" and "an anemic attempt to carry [her] burden as to the clearly-established-law question." *Id*. But here, in opposing the officers' motion for partial summary judgment, Mr Frasier made no clearly-established-law argument at all with respect to his Fourth Amendment conspiracy claim—though he showed that he was aware of this burden by making such an argument regarding other claims elsewhere in his opposition brief. *See* Aplts.' App. at 467 (discussing Mr. Frasier's claim that the officers "conspired to violate [his] constitutional rights," without any mention of the clearly-established-law component (bold-face font and capitals omitted)); *see also id*. at 465 (discussing the clearly-established-law component as to Mr. Frasier's Fourth Amendment unlawful search and detention claims).

In sum, even if the officers forfeited their clearly-established-law arguments, we would exercise our discretion to consider them. *See Cox*, 800 F.3d at 1246 ("In any event, in deciding whether it is a proper exercise of our discretion to overlook the assumed forfeiture of [the defendant] regarding the clearly-established-law question, [the plaintiff's] significant briefing

52

shortcomings on this same question—as to which she bears the burden of proof—should be taken into account. And we do so when we elect here to reach the merits of [the defendant's] qualified-immunity arguments based on the absence of clearly established law."). Mr. Frasier's second threshold argument therefore fails.

**3**

In contending that we should not reach the merits, Mr. Frasier makes one last jurisdictional argument in the following terms: "Defendants' argument about whether the law was clearly established at the time (as to conspiracy to violate . . . Fourth Amendment rights) assumes facts favorable to them. This deprives this Court of jurisdiction to consider the argument." Aplee.'s Resp. Br. at 63. In this regard, Mr. Frasier asserts that he "presented evidence that after the Defendants surrounded him in a circle and demanded the video from him, implying arrest if he refused, he acquiesced and retrieved his tablet [computer] for Evans," but that "Defendants reject this view of the facts." *Id*. at 64. Mr. Frasier's last jurisdictional argument is mistaken and otherwise without merit.

It is quite true that, under our "limited jurisdiction" to review interlocutory, qualified-immunity appeals, our review is restricted to "the district court's abstract legal conclusions," and "we are not at liberty to review a district court's factual conclusions." *Fogarty v. Gallegos*, 523 F.3d 1147, 1153–54 (10th Cir.

2008); *accord Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010). Thus, where a district court "concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Sawyers*, 962 F.3d at 1281 (quoting *Est. of Booker*, 745 F.3d at 409–10); *accord Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010).

But this well-settled prohibition against review of the district court's factual conclusions relates to the district court's factual findings based on the summary-judgment record. That is, the bar pertains to revisiting the court's factual conclusions concerning what facts a reasonable jury could find based on the evidence in that record—construing that evidence in the light most favorable to the plaintiff. That prohibition, however, does not prevent appellate courts—and defendants asserting qualified immunity on interlocutory appeal—from challenging the district court's legal analysis of the facts it has found nor, relatedly, the court's ultimate resolution of the abstract legal questions before it. *Wesby*, 138 S. Ct. at 588 (observing that "the panel majority failed to follow two basic and well-established principles of law" in analyzing the facts underlying its legal probable-cause determination); *cf. Pahls v. Thomas*, 718 F.3d 1210, 1232 (10th Cir. 2013) (holding, in the context of a qualified-immunity

54

interlocutory appeal, that where a district court's "factual determination is predicated on an erroneous legal conclusion, . . . because we may review the latter, we need not accept the former as true"); *Snell*, 920 F.2d at 701 (concluding that "the district court's focus" in analyzing the record facts bearing on the conspiracy "was too narrow" and should have taken into consideration the conspirators' conduct leading up to the allegedly unlawful search).

We believe that Mr. Frasier's jurisdictional argument here reflects a mistaken reading of the substance and thrust of the officers' briefing. Regarding the substance, though they sometimes use more muted language in describing the relevant events, we discern no indication from their briefing that the officers contest the evidence that Mr. Frasier "presented" about the officers surrounding him and demanding that he turn over the video contained on his tablet computer and about Mr. Frasier's contention that he submitted to the officers' demands because he harbored concerns regarding being arrested and going to jail. *See, e.g.*, Aplts.' Opening Br. at 12–13 (noting that, in addition to Officer Evans, "several other officers approached" Mr. Frasier and that "he felt that if he did not show the officers the tablet . . . he was going to jail"); *id*. at 41–42 (without contesting the facts stating, "[t]he court premised its denial of qualified immunity on the portion of the HALO video which depicted a 'heated discussion' between

55

Mr. Frasier and the Officers after which Mr. Frasier purportedly conceded to the Officers' requests by retrieving his tablet [computer] with the video recording").

Moreover, Mr. Frasier has not suggested that the district court did not construe the summary-judgment record in the light most favorable to him. This is significant because the officers leave no doubt, for purposes of this interlocutory appeal, that they accept the facts that the district court found to be supported by the record. *See* Aplts.' Reply Br. at 5 ("The facts found by the district court should be accepted by this Court in ruling on this Appeal."); *see also id*. at 22 ("Defendants do not assume any facts, but rather set forth facts as found by the district court."). Therefore, in doing so, the officers have necessarily accepted the version of the record that is construed in the light most favorable to Mr. Frasier. *Cf. Cox*, 800 F.3d at 1243–44 ("Notably, [the defendant] has accepted the truth of [the plaintiff's] version of the facts for purposes of this appeal. Under our controlling caselaw . . ., that ordinarily will permit us to address the legal issues presented by the agreed-upon set of facts, and there is nothing about this case that would counsel against following that path."); *Farmer v. Perrill*, 288 F.3d 1254, 1258 n.4 (10th Cir. 2002) ("Appellate jurisdiction in cases of this type is clear when the defendant does not dispute the facts alleged by the plaintiff.").

As for the thrust of their briefing arguments, the officers certainly vigorously challenge the scope and nature of the district court's legal analysis of

56

the facts that it found. Among other things, the officers argue that the court's legal analysis of their liability on the Fourth Amendment conspiracy claim omitted relevant, court-found facts concerning whether their actions in surrounding Mr. Frasier and demanding his tablet computer evinced an unlawful conspiracy to search the computer. In other words, they contend that "the district court's focus" in analyzing the record facts bearing on the conspiracy "was too narrow." *Snell*, 920 F.2d at 701. And, relatedly, the court failed to factor into its analysis gaps in the pattern of facts that it did find that were legally significant to the proper resolution of the conspiracy question.

For instance, the officers argue that the court should have factored into its legal analysis the court's own finding that "the video constituted potential evidence possibly relevant to any subsequent criminal proceeding involving [the arrested suspect]." Aplts.' App. at 1024; *see* Aplts.' Reply Br. at 22 (noting among the facts that should have played a role in the district court's legal analysis the fact that "the recording constituted evidence relevant to the Officers' investigation"). Similarly, they contend that the district court should have incorporated into its legal, conspiracy analysis its finding that "[t]he only instance . . . where Officer[] Evans and another one of the Officers conversed outside of Mr. Frasier's presence was *after* the alleged search." Aplts.' Opening Br. at 43; *see also* Aplts.' App. at 1016 (where the court discussed Officer Evans's

57

communication *after* the search "with Sergeant Bothwell and two other officers, holding Mr. Frasier's written statement in his hand").

Furthermore, as for gaps, the officers contend that the district court should have recognized that its findings concerning the officers' conduct did not touch on subjects critical to an affirmative legal determination that the officers participated in an unlawful conspiracy to search the tablet computer: "The court did not find evidence that there was any discussion amongst the Officers regarding the search prior to it taking place." Aplts.' Opening Br. at 42–43. In a similar vein, the officers argue:

> The district court's analysis also fails to take into account the scienter component of a conspiracy claim. Specifically, the court made no effort to differentiate the Officers' lawful objectives to investigate and document the crime committed by [the arrested suspect] and, subsequently Mr. Frasier—in providing deliberately false information—from their allegedly unlawful objective of conducting a warrantless search of the tablet [computer].

*Id*. at 43.

Thus, the thrust of the officers' argument is that—because of the district court's allegedly flawed approach to the facts that it did find—the court erred in reaching the legal conclusion that the facts were sufficient to establish that the officers engaged in a conspiracy to search Mr. Frasier's tablet computer that violated his clearly established Fourth Amendment rights. We conclude that, irrespective of the merits of the officers' arguments—and we do not opine on

58

their merits now—these arguments do not dispute the facts found by the district court, but instead, raise the sort of legal questions that we have jurisdiction to resolve. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (noting that, in conducting a qualified-immunity analysis at the summary-judgment phase, "a court must decide whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct" (citations omitted)); *cf. Plumhoff*, 572 U.S. at 773 (noting, in the qualified-immunity setting, that petitioner-officers "raise legal issues; these issues are quite different from any purely factual issues that the trial court might confront if the case were tried; deciding legal issues of this sort is a core responsibility of appellate courts"). Accordingly, we reject Mr. Frasier's last jurisdictional argument and proceed to the merits.

**D**

Regarding the merits, Mr. Frasier's arguments are woefully deficient and, consequently, he cannot defeat the officers' defense of qualified immunity. Recall that

> [w]hen a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion. The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right

was clearly established at the time of the alleged unlawful activity.

*Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009); *accord Cox*, 800 F.3d at 1245.

Despite doing so before the district court, *see* Aplts.' App. at 467, Mr. Frasier makes no argument at all in his response brief regarding whether the facts that the district court found—construed in the light most favorable to him—support the legal conclusion that the officers violated his Fourth Amendment rights by conspiring to unlawfully search his tablet computer. As such, Mr. Frasier has waived any such argument. *See* FED. R. APP. P. 28(a)(8)(A) & 28(a)(8)(B) (providing that appellants *and* appellees must provide "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant [and the appellees] rel[y]"); *cf. COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1219 n.4 (10th Cir. 2016) (noting that, where plaintiff "makes only passing references to [First Amendment] claims on appeal," those claims are "waived"); *United States v. Yelloweagle*, 643 F.3d 1275, 1280 (10th Cir. 2011) (noting that "where a defendant raises an issue before the district court but does not pursue it on appeal, we ordinarily consider the issue waived"). And this waiver in itself sounds the death knell for Mr. Frasier's challenge to the officers' assertion of qualified immunity. That is because Mr. Frasier must

60

"clear" *both* the constitutional-violation and clearly-established-law "hurdles."

*Riggins*, 572 F.3d at 1107; *accord Felders*, 755 F.3d at 877–78; *see also Pearson*,

555 U.S. at 236 ("The judges of the district courts and the courts of appeals

should be permitted to exercise their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of

the circumstances in the particular case at hand.").

However, even if we consider Mr. Frasier's arguments concerning the

clearly-established-law question, he does not fare much better.  At least here Mr.

Frasier's response brief does make an argument regarding this question but it

amounts to little more than this conclusory statement: "It was also clearly

established that Evans could not illegally search Plaintiff's tablet [computer] and

the Defendants could not conspire to commit an illegal search."  Aplee.'s Resp.

Br. at 64–65.  Standing alone, that conclusory statement would certainly not be

enough to carry his burden.  *See*, *e.g.*, *COPE*, 821 F.3d at 1219 n.4.

Mr. Frasier does, however, cite two authorities to support his position: the

Supreme Court's decision in *Riley v. California*, 573 U.S. 373, 386–87 (2014),

and our decision in *Snell*, 920 F.2d at 701–02.  Aplee.'s Resp. Br. at 65.  But Mr.

Frasier does not apply these authorities to the facts of this case or otherwise

explain why they clearly establish with particularity his Fourth Amendment rights

to be free from the officers' alleged conspiracy.  It should be front of mind by

61

now that—absent the "rare 'obvious case,'" *Wesby*, 138 S. Ct. at 590 (quoting

*Brosseau*, 543 U.S. at 199), where general constitutional principles apply to the

facts "with obvious clarity," *Hope*, 536 U.S. at 741 (quoting *Anderson*, 483 U.S.

at 640), and Mr. Frasier does not argue as to the conspiracy claim that this is such

a case—clearly established law must be "particularized" to the circumstances of

the case. *Apodaca*, 864 F.3d at 1076 ("A precedent is often particularized when it

involves materially similar facts."); *see id.* (noting that the concept of clearly

established law, in relevant part, "requir[es] precedents involving materially

similar conduct"). "It is not enough that the rule is suggested by then-existing

precedent. The precedent must be clear enough that every reasonable official

would interpret it to establish the particular rule the plaintiff seeks to apply."

*Wesby*, 138 S. Ct. at 590.

Neither *Riley* nor *Snell* supplies clearly established law under this standard.

*Riley* is a factually inapposite criminal case that did not have at issue any

allegations of an unlawful conspiracy—much less unlawful conspiracy to violate

the Fourth Amendment. Rather, in *Riley*, the Court was obliged "to decide how

the search incident to arrest doctrine applies to modern cell phones," and on the

pages cited by Mr. Frasier, simply answered the question in the negative, holding

that, when conducting "searches of data on cell phones . . . officers must

generally secure a warrant before conducting such a search." 573 U.S. at 385–86.

Except for both cases involving law enforcement searches of electronic devices, *Riley* bears no resemblance to this case. Therefore, Mr. Frasier's reliance on *Riley* for clearly established law is unavailing.

Mr. Frasier does little better by looking to *Snell* for recourse. Mr. Frasier expressly says in his brief that he cites *Snell* for the proposition that "conspiracy to harass and conduct a retaliatory search is actionable." Aplee.'s Resp. Br. at 65. Yet, it should be patent that this is a far too general legal principle to provide clearly established law for these facts. And, though *Snell* (unlike *Riley*) did at least involve allegations of an unlawful conspiracy, the factual circumstances of that case are starkly different from this one—pertaining to "a search of the [plaintiffs'] home on the basis of known false information" about "child prostitution and pornography." *Snell*, 920 F.2d at 701. There are simply no "materially similar facts" that could permit *Snell* to serve as clearly established law for the alleged conspiracy here. *Apodaca*, 864 F.3d at 1076. Therefore, *Snell*, too, does not help Mr. Frasier. Because it is Mr. Frasier's burden to show that any alleged Fourth Amendment right that he possessed to be free from the officers' conspiracy to search of his tablet computer was clearly established in August 2014, and he has not done so, we may determine—on this independent ground as well—that Mr. Frasier cannot defeat the officers' defense of qualified immunity.

63

\*\*\*

In sum, we have concluded at the threshold that our determination that the officers are entitled to qualified immunity as to Mr. Frasier's First Amendment retaliation claim necessarily means that they are entitled to qualified immunity concerning Mr. Frasier's First Amendment conspiracy claim. And, after the foregoing analysis, we conclude that the district court erred in denying the officers qualified immunity with respect to Mr. Frasier's Fourth Amendment conspiracy claim based on the search of his tablet computer.

## IV

In sum, we **REVERSE** the district court's partial denial of the officers' motions for summary judgment on the grounds of qualified immunity. We **REMAND** the case to the district court for further proceedings consistent with this opinion.