**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

KRYSTAL O'CONNELL,

    Plaintiff - Appellee,

v.

MARCIA TUGGLE, former
caseworker of the Alamosa
Department of Human Services,

    Defendant - Appellant,

and

HARRY ALEJO, former Alamosa
County Sheriff's Office Sergeant;
BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF ALAMOSA,
COLORADO; ROBERT JACKSON,
Sheriff of Alamosa County,
Colorado,

    Defendants.

No. 20-1148
(D.C. No. 1:18-CV-01359-RBJ)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BRISCOE**, and **EID**, Circuit Judges.
_____

---

[*]    This order and judgment does not constitute binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. But the order and judgment may be cited for its persuasive value if otherwise appropriate. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

This appeal stems from notes that a social worker made after interviewing a woman suspected of child abuse. The social worker (Ms. Marcia Tuggle) wrote that the woman (Ms. Krystal O'Connell) had confessed. Ms. O'Connell denied confessing and presented evidence that Ms. Tuggle had lied in her notes about the alleged confession. Did the law clearly establish Ms. O'Connell's constitutional protection from the social worker's fabrication of a confession in a criminal investigation? The district court answered "yes," as we do.

1.    **Ms. Tuggle allegedly fabricated a confession by Ms. O'Connell.**

In 2003, Ms. O'Connell left her young son, Kyran, in the care of Mr. Patrick Ramirez. Doctors soon diagnosed Kyran with serious brain injuries, and he died about two months later.

The police opened an investigation. Sergeant Harry Alejo interviewed Mr. Ramirez, who told the police that he was carrying Kyran when he fell.

Ms. Tuggle also investigated. She interviewed Mr. Ramirez, who repeated what he had told Sergeant Alejo. Two days later, Ms. Tuggle and Sergeant Alejo attended doctors' meetings and interviewed witnesses.

Sergeant Alejo first interviewed Ms. O'Connell without anyone else in the room. Later the same day, Sergeant Alejo and Ms. Tuggle conducted a joint interview of Ms. O'Connell. According to Ms. O'Connell, Sergeant Alejo hurled accusations while Ms. Tuggle watched. Ms. Tuggle noted the

2

responses, stating that Ms. O'Connell had admitted shaking Kyran and slamming him on the bed. Ms. O'Connell denied saying this and presented evidence that Ms. Tuggle had fabricated the confession.

Ms. O'Connell was ultimately convicted of child abuse resulting in Kyran's death. But in 2017, Ms. O'Connell's conviction was overturned. She then sued Ms. Tuggle for a denial of due process. The district court denied Ms. Tuggle's motion for summary judgment, rejecting her argument for qualified immunity.

**2.     We have jurisdiction.**

Ms. O'Connell moves to dismiss the appeal for lack of jurisdiction. We deny this motion.

Appellate jurisdiction exists when a district court denies qualified immunity based on an issue of law. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). The appeal turns on an issue of law because Ms. Tuggle concedes "the most favorable view of the facts to [Ms.] O'Connell." Appellant's Opening Br. at 14. Under this view, we follow the district court in crediting allegations that Ms. Tuggle had participated in an investigation into Ms. O'Connell, had participated in an interview with Sergeant Alejo, and had taken notes regarding the investigation. Ms. Tuggle has also conceded the use of her notes to deprive Ms. O'Connell of her liberty. So

Ms. Tuggle has raised a purely legal question, triggering appellate jurisdiction.[1]

### 3.     To determine whether the constitutional right was clearly established, we conduct de novo review.

In exercising this jurisdiction, we conduct de novo review. *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). For this review, we apply the same standard that governed in district court, which allows summary judgment only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Id.* In determining the existence of a dispute of material fact, we must view the evidence in the light most favorable to the nonmoving party, Ms. O'Connell. *Id.*

Ms. Tuggle moved for summary judgment based on qualified immunity. So when viewing the evidence favorably to Ms. O'Connell, the district court must deny Ms. Tuggle's motion for summary judgment if

- a factfinder could reasonably find facts showing the violation of a constitutional right and

- the right was clearly established when Ms. Tuggle engaged in misconduct.

*Id.* at 900–01.

Ms. Tuggle does not contest the existence of facts showing the violation of a constitutional right. She instead argues that the underlying

---

[1]     Ms. O'Connell also argues that we lack jurisdiction because the assertion of qualified immunity is frivolous. Though we reject Ms. Tuggle's assertion of qualified immunity, her arguments are not frivolous.

4

right had not been clearly established. A right is clearly established only if a reasonable official would understand that the challenged conduct violates that right. *Perry v. Durborow*, 892 F.3d 1116, 1122–23 (10th Cir. 2018). Generally, a right is clear when it is apparent from controlling precedent or the clear weight of persuasive authorities from other circuits. *Id.* at 1123. But even without precedential or persuasive authorities, a right can be clearly established when it is obvious. *See Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam). "After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015) (Gorsuch, J.).

**4.    Ms. O'Connell had a clearly established constitutional protection against the fabrication of evidence in a criminal investigation.**

To decide whether Ms. Tuggle violated a clearly established constitutional right, we must determine the universe of facts that we can consider. Given the denial of summary judgment, we credit Ms. O'Connell's allegations as true even if our own review of the record might suggest otherwise. *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015).

The district court credited five of Ms. O'Connell's allegations bearing on qualified immunity:

1.    Ms. Tuggle had participated in the investigation of Ms. O'Connell and contributed to the deprivation of her liberty.

5

2.    Two interviews of Ms. O'Connell had taken place. In the first one, Sergeant Alejo had conducted the questioning alone. Then Sergeant Alejo, Ms. O'Connell, and Ms. Tuggle went to another room. In that room, both Sergeant Alejo and Ms. Tuggle combined to question Ms. O'Connell.

3.    Ms. Tuggle had "participated in investigatory interviews which solicited a confession from [Ms. O'Connell]." Appellant's App'x vol. 5, at 1266.

4.    During the second interview, with Ms. Tuggle present, Sergeant Alejo had "asked [Ms. O'Connell's husband] to leave and then began to interrogate her, accusing her of lying and stating that she [had] slammed Kyran against the wall." *Id.* at 1252.

5.    In her notes, Ms. Tuggle had "deliberately falsified information" about Ms. O'Connell's statements." *Id.* at 1268.

Given these allegations, we must consider the obviousness of a constitutional violation when Ms. Tuggle fabricated a confession of child abuse

- while "participating in investigatory interviews"

- as she combined with Sergeant Alejo in the questioning just after he'd accused Ms. O'Connell of child abuse.

*See* pp. 5–6, above.

"[A] defendant's due process rights are implicated when the state knowingly uses false testimony to obtain a conviction." *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004).[2] Ms. O'Connell alleges a denial of

---

[2]    We decided *Pierce* after Ms. Tuggle's alleged fabrication of the confession. But in *Pierce*, we were referring to what an official should have known in 1986—roughly seventeen years before Ms. Tuggle's alleged fabrication of the confession. 359 F.3d at 1299.

6

due process through the knowing use of false testimony. Under Ms. O'Connell's version of events, Ms. Tuggle could not "have labored under any misapprehension that the knowing or reckless falsification . . . of evidence was objectively reasonable." *Id.*

According to Ms. Tuggle, the constitutional violation wasn't obvious because she had investigated "separately" from Sergeant Alejo. Appellant's Opening Br. at 18. But the district court credited the allegations that Ms. Tuggle had participated in the investigation with Sergeant Alejo, had participated in investigatory interviews, and had fabricated reports "subsequently used to arrest and prosecute" Ms. O'Connell. Appellant's App'x vol. 5, at 1266.

Ms. Tuggle knew that there was a criminal investigation of Ms. O'Connell.[3] After all, Ms. Tuggle had watched Sergeant Alejo accuse Ms. O'Connell of child abuse. *See* pp. 2, 5–6, above. And Ms. Tuggle knew that in the criminal investigation, her agency would need to share her notes with the sheriff's office. Appellant's App'x vol. 4, at 1083, 1090; *see* Colo. Stat. Ann. § 19–3–304(1), (2)(m) (2003) (requiring a social worker to report information about child abuse to the county department or local law enforcement agency).

---

[3]    The dissent states that the district court found no relevance in Ms. Tuggle's knowledge and intent about the criminal investigation. Dissent at 17 n.3. But the district court never said that Ms. Tuggle's knowledge and intent were irrelevant.

The dissent states that Ms. Tuggle "would not have been aware that her notes would be used in [the] prosecution." Dissent at 17. This statement clashes with the district court's ruling and even Ms. Tuggle's own testimony.

The district court credited Ms. O'Connell's allegations that Ms. Tuggle had

- seen Sergeant Alejo accuse Ms. O'Connell of child abuse,

- participated with Sergeant Alejo in questioning Ms. O'Connell, and

- "fabricated reports from those interviews, which included inculpatory statements made by [Ms. O'Connell] that were subsequently used to arrest and prosecute her."

*See* pp. 5–6, above; Appellant's App'x vol. 5, at 1266.

After participating in the joint questioning with Sergeant Alejo, Ms. Tuggle wrote this in her notes:

> she had shook [redacted] "really hard"
> and then "slammed him on the bed".
>
> After "slamming" him on the bed, she
> remembers rubbing his stomach a lot and says
> that she thinks that she might have hurt him.
>
> She also stated that she thinks that
> she made "marks on his chest".

On Wednesday, February 4, 2003, this caseworker went to Children's Hospital to meet for a staffing at the Kemp Center with [redacted] doctors, medical staff and social workers. Sgt. Alejo was also at Children's Hospital attempting to complete his interviews with [redacted] parents, Krystal and Damien. By this time, the medical evidence was strongly indicating that [redacted] was a "shaken baby" and the initial description by Patrick Ramirez, of how the injuries occurred, did not match the physical trauma experienced by [redacted].

After Sgt. Alejo had completed his interviews with Damien and Krystal and a staffing had been held, it was decided that DSS would be allowed to briefly visit with the parents, hear their statements and explain DSS protective issues regarding [redacted].

At 2:50 pm. Sgt. Alejo introduced this worker to Krystal Voss and Damian Gaston. This caseworker explained that DSS would be involved with the family because of the suspicious circumstances regarding the child's injuries. Krystal did not want her family to know about DSS involvement. Krystal then started crying and said that [redacted] had been crying a lot on Thursday night (January 29th) she had shook [redacted] "really hard" and then "slammed him on the bed". After "slamming" him on he bed, she remembers rubbing his stomach a lot and says that she thinks that she might have hurt him. She also stated that she thinks that she made "marks on his chest". She then said that he was fussy in the morning but thought that he was o.k. Damien says that he was asleep at the time and when he left for work in the morning, assumed that [redacted] was sleeping safely in his crib. Krystal was very distraught, crying and upset saying that she doesn't have any patience. After discussing health care decisions with the parents, the meeting was concluded.

Appellant's App'x vol. 1, at 112. Given the supposed admission of child abuse during the joint interview, Ms. Tuggle would obviously expect to share her notes with law enforcement.

Ms. Tuggle elsewhere admitted that she had known that a confession would require her office to furnish her notes to law enforcement:

> Q.    If you obtained a statement from somebody wherein he admitted to taking acts that might be endangering a child or abusing a child, would you have an obligation to give that information to law enforcement?

A.    If it rose to the level that it could be criminal, I would be obligated by law to make that report to law enforcement, yes.

. . . .

Q.    Okay. So when there's a criminal investigation, you -- Social Services has to share their notes with the sheriff's office; is that right?

A.    Yes.

Q.    So you -- and you knew that -- you knew that as a matter of course in your job as a social worker, right?

A.    Yeah.

*Id.* vol. 4, at 1083, 1090.

From Ms. Tuggle's own testimony, the existence of an ongoing criminal investigation would have been obvious. And Ms. Tuggle's own notes reflect Ms. O'Connell's confession to the crime of child abuse. From the existence of the criminal investigation and the confession of child abuse, Ms. Tuggle recognized that her office would need to share her notes with the sheriff's office.

So under Ms. O'Connell's version of events, Ms. Tuggle obviously knew—when she fabricated the confession—that her fabricated report would go to the sheriff's office to advance the criminal investigation. Given that knowledge, any reasonable social worker in Ms. Tuggle's position would have known that lying about a confession would contribute to the prosecution of Ms. O'Connell for child abuse. *See Truman v. Orem*

10

*City*, 1 F.4th 1227, 1240 (10th Cir. 2021) (concluding that a prosecutor's fabrication of evidence would have constituted an "obvious" violation in 2013 "even [if] existing precedent [had] not address[ed] similar circumstances") (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)) (first alteration in original). Given that knowledge, Ms. O'Connell's version of events would create an obvious denial of due process. We thus affirm the denial of summary judgment to Ms. Tuggle.

Entered for the Court


Robert E. Bacharach
Circuit Judge

No. 20-1148, *O'Connell v. Tuggle, et al.*
**BRISCOE**, Circuit Judge, concurring in part and dissenting in part.

This is an interlocutory appeal brought by a social worker, Marcia Tuggle ("Defendant"), from a denial of qualified immunity in a § 1983 action filed by Krystal O'Connell ("Plaintiff"). Only for the purpose of this appeal, Defendant concedes that she included in a social services report, and related interview notes, fabricated statements which she attributed to Plaintiff, who was later convicted of child abuse resulting in the death of a child.

The statements at issue which were included in Defendant's report and related notes are similar to the statements Plaintiff had made earlier to Sergeant Alejo and which were included in a confession written and signed by the Plaintiff. Plaintiff was arrested as a result of the confession she gave to Sergeant Alejo and long before Defendant's report and notes were subpoenaed.

Defendant asserts that she is entitled to qualified immunity as to Plaintiff's Fourteenth Amendment due process claim because it was not clearly established in February 2003 that notes fabricated during the course of a social services investigation violate a parent's constitutional rights associated with a separate, but related, criminal investigation. I agree. Accordingly, I would conclude Defendant is entitled to qualified immunity, and the district court's denial of Defendant's motion for summary judgment should be reversed, and the case remanded.

**I**

**A. Factual Background**

On January 31, 2003, Plaintiff's young son, Kyran, was diagnosed with serious brain injuries and flown by helicopter to a hospital in Denver. That evening, Harry Alejo, a sergeant with the Alamosa County Sherriff's Office, interviewed Patrick Ramirez, Kyran's babysitter, about the events leading to Kyran's injury. According to Ramirez, Kyran was injured when he fell from Ramirez's shoulders while they were walking outside. In a later interview, Ramirez admitted to smoking marijuana and drinking beer while caring for Kyran. On February 2, Ramirez was arrested for having caused Kyran's injuries. On February 3, Defendant, a caseworker with the Alamosa County Department of Social Services, conducted a social services investigation to address the proper care and custody of Kyran going forward. As part of her investigation, Defendant interviewed Ramirez in jail, at which time Ramirez reiterated his earlier statements.

On February 4, Sergeant Alejo interviewed Plaintiff with no one else present. During that interview, Plaintiff signed a written confession, stating that she "shook [Kyran] 2–3 times, and probably more violently than [she] meant to." Aplt. App., Vol. 5 at 1252. The parties dispute the veracity and voluntariness of the written confession, as well as the substance of Sergeant Alejo's interview with Plaintiff.[1]

---

[1] In her criminal trial, Plaintiff filed a motion to suppress her February 4 written confession and statements given to Sergeant Alejo, contending they were coerced and involuntary. The motion was denied, and Plaintiff's written confession and statements were admitted at trial. *See* Aplt. App., Vol. 5 at 1253.

Later that day, Defendant also interviewed Plaintiff.  Kyran's father and Sergeant

Alejo were also present at that interview.  In Defendant's report of her interview,

Defendant noted that Plaintiff admitted to shaking Kyran "really hard" and

"slamm[ing] him on the bed."  *Id.*, Vol. 1 at 112.  Plaintiff alleges that during the

interview, Sergeant Alejo asked Kyran's father to leave the room, and then Sergeant

Alejo also questioned Plaintiff.

On February 5, after Ramirez had been in jail for three nights, he recanted his

earlier statements.  Ramirez then claimed that he had been covering for Plaintiff, and

that Kyran had been hurt before Ramirez arrived at the house.  Later that day,

Plaintiff was arrested on a warrant that had been issued pursuant to an affidavit filed

by Sergeant Alejo.  Kyran later died of his injuries on March 24, 2003.  Plaintiff was

subsequently charged with, and convicted of, child abuse resulting in death; her

conviction was upheld on appeal.

In August 2017, after filing a postconviction petition, Plaintiff was granted a

new trial based on ineffective assistance of counsel.  The reviewing judge concluded

that Plaintiff's trial counsel failed to pursue medical evidence that Kyran's injuries

may have been consistent with his having fallen from Ramirez's shoulders.  The

district attorney elected not to re-try Plaintiff, the charges against her were dismissed,

and she was released from custody.  At that point, Plaintiff had been incarcerated for

ten years.

### B. Procedural Background

In 2018, Plaintiff filed this § 1983 suit against Sergeant Alejo and Defendant, among others. Among her claims, Plaintiff alleged that Defendant violated her Fourteenth Amendment due process rights by fabricating evidence against her which led to her prosecution and incarceration. Specifically, Plaintiff alleged that Defendant fabricated inculpatory statements in a social services report and related notes that were later subpoenaed and used in Plaintiff's criminal case. Defendant filed a motion for summary judgment, asserting qualified immunity against Plaintiff's fabrication of evidence claim. The district court concluded that Defendant was not entitled to qualified immunity and denied summary judgment as to the fabrication of evidence claim. The district court stated its ruling in summary:

> Based on Between [sic] *Snell* and *Franks* (and, frankly, common sense), I find that it was clearly established that a social worker, like any other public official, cannot knowingly create false information in furtherance of an investigation. Because [Plaintiff] alleges that [Defendant] deliberately falsified information in her report, I find this alleged violation to be clearly established, and that [Defendant] is not entitled to qualified immunity.

*Id.*, Vol. 5 at 1268.

The district court granted summary judgment in favor of Defendant as to Plaintiff's other claims. Defendant timely appealed the district court's denial of qualified immunity.

4

## II

### A. Standard of Review

We review a district court's denial of qualified immunity de novo. *Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009). Our review is limited, however, to questions of law. "[I]t is not our province to determine whether the record supports the district court's factual assumptions; instead, we simply take, as given, the facts that the district court assumed when it denied summary judgment for a purely legal reason." *Id.* (internal quotations and alterations omitted). "So . . . if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own de novo review of the record might suggest otherwise as a matter of law." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010).

"[W]e review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Bowling*, 584 F.3d at 964. "Unlike most affirmative defenses . . . the plaintiff would bear the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). Thus, a defendant who asserts qualified immunity is entitled to summary judgment, unless the plaintiff shows that a reasonable factfinder could conclude that "(1) [the defendant] violated a federal statutory or constitutional right, and (2) the unlawfulness of [the defendant's] conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle*

5

*v. Howards*, 566 U.S. 658, 664 (2012)).  Courts have discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## B.  This Court Has Jurisdiction Over Defendant's Interlocutory Appeal

I concur in the majority's denial of Plaintiff's motion to dismiss for lack of jurisdiction.  Plaintiff asserts that Defendant does not appeal a purely legal issue, but instead seeks to "back-door" factual arguments under the guise of legal argument. *See* Aple. Mot. Dismiss at 9.  As a result, Plaintiff argues, Defendant's interlocutory appeal should be dismissed because we have no jurisdiction to review the district court's factual findings or to resolve factual disputes.

Federal appellate courts have jurisdiction to review only "final decisions."  28 U.S.C. § 1291.  "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  Thus, jurisdiction is proper "over appeals challenging the denial of a qualified-immunity-based motion for summary judgment only if a defendant-appellant does not dispute the facts a district court determines a reasonable juror could find but, instead, 'raises only legal challenges to the denial of qualified immunity based on those facts.'"  *Ralston v. Cannon*, 884 F.3d 1060, 1067 (10th Cir. 2018) (quoting *Henderson v. Glanz*, 813 F.3d 938, 948 (10th Cir. 2015)).

6

For the purposes of this appeal, Defendant concedes "that [Defendant] knowingly fabricated elements of her notes during the course of her Social Services' child abuse investigation to include inculpatory statements made by Plaintiff." Aplt. Resp. Mot. Dismiss at 9; *see also* Aplt. Opening Br. at 14 (conceding "for purposes of this appeal the most favorable view of the facts to [Plaintiff]"). Defendant only challenges the district court's legal conclusion that the law guiding her conduct was "clearly established." Defendant does not raise a factual challenge regarding the conduct at issue, i.e., that she fabricated elements of her notes and report during a social services investigation. Nor does Defendant dispute the facts that the district court determined a reasonable juror could find. *Ralston*, 884 F.3d at 1067 (no interlocutory jurisdiction to review whether there is a triable issue of fact). Accordingly, I agree our jurisdiction is proper as we are left with only issues of law.

Plaintiff's jurisdictional argument also appears to misunderstand Defendant's merits argument on appeal. Plaintiff asserts that Defendant contests the district court's factual findings by claiming Defendant's "fabrication of evidence did not occur in connection with a criminal investigation or prosecution," and that her "fabricated notes were not part of the criminal investigation." Aple. Answer Br. at 27 (citing Aplt. Opening Br. at 23, 29). Yet, as Defendant's arguments make clear, Defendant does not dispute whether her notes were *used* in Plaintiff's prosecution; rather, Defendant only asserts that her notes were not *created* for use in Plaintiff's prosecution.

7

Defendant's argument on appeal is consistent with the district court's characterization of the facts. The district court similarly treated Defendant's notes as being initially created for the purpose of a social services investigation—not a criminal investigation. For example, the district court found that Defendant "[did] not dispute that she participated in an investigation into [Plaintiff]." Aplt. App., Vol. 5 at 1266. Although Defendant acknowledged that she participated in a social services investigation, she vigorously disputed any personal involvement in a criminal investigation. *See id.*, Vol. 1 at 87–88. Similarly, in addressing whether the law was clearly established, the district court relied on language in *Snell v. Tunnell* indicating that using known false information to obtain a court order to search a home is unconstitutional "even in the context *of a child abuse investigation*." *Id.*, Vol. 5 at 1268 (citing *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)) (emphasis added). Because Defendant raises a purely legal question and does not challenge the district court's review for evidence sufficiency, we have jurisdiction over this interlocutory appeal.

**C. Defendant's Argument Is Preserved**

Plaintiff's assertion that Defendant failed to present her argument to the district court is without merit. Defendant expressly presented the same argument to the district court as she presents here. Specifically, in her motion for summary judgment, under a subsection titled "There Was A Lack Of Personal Participation By [Defendant]," Defendant distinguished social services investigations from criminal investigations:

8

> Personal participation is an essential allegation in a §1983
> civil rights action. *Bennett v. Passic*, 545 F.2d 1260, 1262–63
> (10th Cir. 1976). Plaintiff must show that the individual
> defendant caused the deprivation of a federal right. *Kentucky
> v. Graham*, 473 U.S. 159, 166 (1985). Plaintiff's case is
> based entirely on the criminal charges brought against her,
> and is not based on any social services child custody
> proceedings. A social worker does not initiate and prosecute
> criminal charges. *Franz v. Lytle*, 997 F.2d 784, 791 (10th Cir.
> 1993) (while a criminal prosecution may emanate from the
> social worker's activity, that prospect is not a part of the
> social worker's cachet); Ex. N, Tuggle depo, P24, ln.10–25.
> Accordingly, Plaintiff's claims should be dismissed against
> [Defendant] based on lack of personal participation.

App., Vol. 1 at 87–88.

In that same motion, Defendant also explained why the distinction between

social services investigations and criminal investigations showed that she was

entitled to qualified immunity because the law was not clearly established in 2003:

> This case does not involve the typical situation in which a
> social worker is sued for her actions or failure to act in the
> protection of a child. [Defendant] is unaware of any legal
> authority which holds a social worker liable for violation of
> the constitutional rights of a parent with respect to the
> criminal prosecution of that parent for causing harm to the
> child. Because there was no clearly established legal
> authority in January/February 2003 to guide [Defendant] in
> her conduct in this matter, [Defendant] is entitled to qualified
> immunity.

*Id.* at 91.

And, in her reply brief in support of her motion for summary judgment,

Defendant distinguished her conduct from *Snell* on the same grounds she now asserts

on appeal:

9

> *Snell v. Tunnel[l]*, 920 F.2d 673 (10th Cir. 1990) is factually dissimilar as it involved social services workers along with the police entering and searching the plaintiff's home without probable cause and a warrant procured with known false allegations.  The present matter did not involve [Defendant's] search of Plaintiff or her home and Plaintiff's arrest warrant was not predicated on any information from [Defendant's] interview with Plaintiff or [Defendant's] notes.

*Id.*, Vol. 5 at 1210.

The district court addressed, and rejected, Defendant's arguments that she did not personally participate in the violation of Plaintiff's constitutional rights, and that the law was not clearly established.  *See id.* at 1265 (distinguishing *Franz*); *id.* at 1268 (relying on *Snell*).

Like her jurisdictional argument, Plaintiff's waiver argument stems from her misunderstanding of Defendant's argument on appeal.  Plaintiff complains that "[Defendant] never argued below that her fabricated notes and report were not *used* in Plaintiff's criminal proceedings to deprive her of liberty without due process." Aple. Answer Br. at 31 (emphasis added).  Yet, as explained above, Defendant concedes for the purposes of this appeal that her notes were "used" in Plaintiff's criminal case; Defendant only asserts that her notes were not "created" for the purpose of prosecuting Plaintiff, which is consistent with the district court's ruling. Accordingly, Defendant's argument is preserved.

## D.  Plaintiff Has Not Shown That the Law Was Clearly Established

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he

10

is doing' is unlawful.  In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'"  *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  Ordinarily, to show that a right was "clearly established" in our circuit, "the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021).  "Typically, the precedent must have clearly established the right 'in light of the specific context of the case, not as a broad general proposition.'"  *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  "It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every reasonable official' would know."  *Wesby*, 138 S. Ct. at 590 (citations omitted).  Accordingly, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 613 (2015)).  That said, "under certain 'extreme circumstances,' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful."  *Frasier*, 992 F.3d at 1015 (citing *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[T]he salient question that the Court of

11

Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of [petitioner] was unconstitutional.").

When considered in the factual context of this case, I find no clearly applicable Tenth Circuit or Supreme Court case law that would have alerted Defendant that her actions would violate the constitutional rights Plaintiff now asserts. Plaintiff primarily relies on three cases: *Franks v. Delaware*, 438 U.S. 154 (1978); *Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990); and *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004). Plaintiff asserts that these cases, when read together, show that "government officials—including social workers—could not fabricate false evidence for use in a criminal investigation and prosecution." Aple. Answer Br. at 37. Defendant asserts that the law was not clearly established that fabricating a social services report violates constitutional rights associated with criminal investigations. I agree with Defendant that the law was not clearly established.

In 1978, *Franks* established that the Fourth and Fourteenth Amendments entitle a defendant to an evidentiary hearing testing the validity of a search warrant, where the defendant offers proof of deliberate falsehood or reckless disregard for the truth in statements contained in the affidavit presented in support of a warrant request, and where the affidavit would not support a finding of probable cause after setting aside the challenged material. 438 U.S. at 171–72. The Supreme Court recognized an "obvious assumption . . . that there will be a *truthful* showing" in a warrant affidavit by the affiant. *Id.* at 164–65 (emphasis in original). The Supreme Court also recognized that the right to an evidentiary hearing and the implicit

12

requirement that the government rely on truthful evidence when seeking judicial authorization for a warrant are derived from the warrant requirement under the Fourth Amendment, as well as the Fourteenth Amendment and the exclusionary rule as incorporated against the states. *Id.* at 164 (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

In 1990, in *Snell*, this court applied *Franks* to administrative searches conducted by social workers engaged in a social services investigation. 920 F.2d at 699–700. The plaintiffs in *Snell* alleged that social workers knowingly fabricated evidence of child abuse, pornography, and prostitution to procure a "pick-up" order. The "pick-up" order authorized the social workers to enter the plaintiffs' home, identify the children residing there, and separate those children from the plaintiffs. *Id.* at 677.

In *Snell*, we held that the social workers were not entitled to qualified immunity because "even in the context of a child abuse investigation, a reasonable public official would have known that using known false information to secure an order to justify entry and search of a private home would violate the fourth amendment's proscription on unreasonable searches and seizures." *Id.* at 700. In reaching that conclusion, we recognized that "[a]lthough developed in the warrant context, the principles of *Franks* appl[ied] to the information used in [that] case." *Id.* Specifically, we reasoned that "equally implicit in the concept of reasonableness [under the Fourth Amendment] is that the information on which the social worker proceeds upon [to obtain a pick-up order] is not *known* to be false." *Id.* at 699

13

(emphasis in original). We also analogized a social worker's deliberate reliance on known falsehoods to perjury, reasoning that "perjury is not objectively reasonable conduct." *Id.* at 698 (citing *Myers v. Morris*, 810 F.2d at 1457).

In 2004, in *Pierce*, we applied *Franks* to lab reports written by a forensic scientist employed by the Oklahoma City Police Department. In that case, after the plaintiff's arrest for rape in 1986, officers requested consent to collect head and hair samples from the plaintiff, informing him that "if the hairs did not match [crime scene evidence] he would be released." 359 F.3d at 1282. A forensic scientist falsely reported that the crime scene evidence was "microscopically consistent" with the samples taken from the plaintiff. *Id.* Contrary to that report, subsequent audits showed that the crime scene evidence was *not* consistent with the samples taken from the plaintiff, and, in fact, a DNA analysis later exonerated the plaintiff. *Id.* at 1283. The plaintiff then brought a § 1983 claim against the forensic scientist.

We held the forensic scientist was not entitled to qualified immunity. We concluded the law was clearly established in 1986 that "the deliberate or reckless falsification or omission of evidence was a constitutional violation—even though the arrest had already occurred." *Id.* at 1299. We again relied upon the general principle announced in *Franks* that police cannot knowingly rely on false information to obtain a warrant. *Id.* We also relied upon the Supreme Court's holdings that a state may not knowingly rely on false testimony to obtain a conviction or withhold exculpatory evidence from the defense. *Id.* (citing *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) and *Brady v. Maryland*, 373 U.S. 83 (1963)).

14

None of those cases would have provided a reasonable social worker in Defendant's position with fair notice that fabricating a social services report violates constitutional rights related to a criminal investigation. *Franks* and *Pierce* do not describe similarly situated officials. Those cases described law enforcement officers or those working for law enforcement for the purpose of investigating crimes. Here, Defendant was a social worker responsible for drafting a social services report. To be sure, Sergeant Alejo was present during Defendant's interview with Plaintiff, and Defendant was likely aware of a potential criminal prosecution. The mere presence of a law enforcement officer, however, is clearly dissimilar from a forensic scientist investigating crime scene evidence while employed by the police department and knowing full well the evidentiary purpose and importance of her report. *See Pierce*, 359 F.3d at 1281. Thus, Defendant lacked fair notice that the holdings of *Franks* or *Pierce* would apply to a social worker in her position.

Plaintiff asserts that "the fact that [Defendant] was a caseworker and not a police officer should have no impact on the result here." Aple. Answer Br. at 38. Plaintiff's argument has some force but is not clearly established in our case law. We have elsewhere recognized that dicta in *Snell* and *Franz* "could be construed as drawing distinctions between . . . social workers and law-enforcement officers." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1249 (10th Cir. 2003). As we noted in *Roska*, this distinction "of course, runs contrary to the general principle under which we focus on the function being performed by the state actor, rather than her particular job title, in conducting our immunity analysis." *Id.* at 1249 n.18; *see also*

15

*Franz*, 997 F.2d at 791 (noting that our case law "has looked to the function the official performs to examine qualified immunity claims"). Yet, in *Roska*, we did not clearly repudiate all distinctions between social workers and law enforcement officers, and I would decline to do so here. The fact that Defendant was a "social worker"—and not a law enforcement officer or a specialist employed by law enforcement to opine on key evidence—is enough to distinguish this case from *Franks* and *Pierce* for the purposes of determining whether the law was clearly established as to Plaintiff's fabrication of evidence claim.[2]

Further, even if we were to look past Defendant's title, Defendant was not functioning as a law enforcement officer or criminal investigator. As discussed above, Defendant was primarily investigating child abuse in the social services

---

[2] We should be careful not to conflate "probable cause and a warrant or exigent circumstances" with "something approaching probable cause." *Roska*, 328 F.3d at 1249–50 & n.23. The *Roska* court expressly distinguished these two standards. The former is the standard established in *Roska* itself. *See id.* at 1250 n.23 ("the law is *now* clearly established") (emphasis added). The latter is the standard clearly established by *Franz* and *Snell*. And, because the social workers in *Roska* had "substantial cause" to believe the child was in substantial, non-exigent danger, we held that their "warrantless entry and seizure *did not* violate clearly established law under the Fourth Amendment as it stood [at the time of the violation]." *Id.* at 1250 (emphasis added).
    The light between these two standards illustrates the differing constitutional restrictions on social workers and police officers. Indeed, we recognized in *Roska* that "*Franz* and *Snell* injected a degree of uncertainty" into how the warrant requirement applies to social workers. *Id.* at 1249. And, although we held that the warrant requirement applied to the social workers in that case, we declined to address other possible distinctions between social workers and police officers, such as entering a home "to assure the safety of the child's conditions," *id.* at 1242 n.9, or an inspection of the child himself, *id.* at 1249 n.21. Thus, I would disagree with any implication that the Fourth Amendment restrictions on social workers are clearly congruent with those on police officers.

16

context.  There is no indication that Defendant prepared her report for use in a criminal investigation or intended for her report to be used in a criminal prosecution. And although Sergeant Alejo's presence may have alerted Defendant to the possibility of a criminal prosecution, Defendant would not have been aware that her notes would be used in that prosecution.  Indeed, Defendant's notes were not subpoenaed until over a year after Plaintiff's arrest.  Aplt. App., Vol. 4 at 1090.[3]

Unlike *Franks* and *Pierce*, *Snell* expressly addressed the immunity of social service workers "in the context of a child abuse investigation."  920 F.2d at 700. Yet, *Snell* is distinguishable on other grounds.  In *Snell*, we addressed search and seizure rights under the Fourth Amendment.  *Id.* at 698.  Here, however, Plaintiff does not allege an unconstitutional search or seizure.  Instead, Plaintiff only asserts Fourteenth Amendment Due Process rights related to her criminal prosecution—

---

[3] The majority overstates Defendant's knowledge and intent.  *See, e.g.*, Maj. at 7–10 ("[Defendant] *knew* that in the criminal investigation, her agency *would need* to share her notes with the sheriff's office.") (emphases added), *id.* at 7; ("[A]ny reasonable social worker in [Defendant]'s position would have *known* that lying about a confession *would contribute* to the prosecution of [Plaintiff] for child abuse.") (emphases added), *id.* at 10.  In her deposition, Defendant only indicated that she was vaguely aware that her notes "might" be used as evidence in a criminal case.  Aplt. App., Vol. 4 at 1090.  Accordingly, the district court did not find an issue of material fact that Defendant "knew" her notes "would" be used in such a manner. Rather, the district court held that Defendant's knowledge and intent regarding the criminal investigation was irrelevant because her participation in a separate, social services investigation still "contributed to [Plaintiff]'s deprivation of liberty."  Aplt. App., Vol. 5 at 1266.  But, absent such knowledge and intent, Defendant's conduct falls outside the ambit of *Pierce*.  And, if I were to construe the district court's order as the majority does, then I would also have to construe Defendant's appeal as a challenge to evidence sufficiency and dismiss the appeal for lack of jurisdiction. *Johnson*, 515 U.S. at 313.

17

rights that were not addressed in *Snell*. Thus, the constitutional violation that Plaintiff now asserts could not have been clearly established in *Snell*.

I do not read *Snell* as holding that it is categorically unconstitutional for social workers to fabricate evidence of child abuse. Such a reading of *Snell* would impermissibly "define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152. In addition to considering the circumstances leading to the alleged fabrication of evidence, our immunity analysis must also consider the manner in which that evidence was used. *See Warnick v. Cooley*, 895 F.3d 746, 753 (10th Cir. 2018) ("We are aware of no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution.") (internal quotations and citations omitted). Because the evidence at issue here was not used to support an unconstitutional search, *Snell* is inapposite.[4]

Nor does "the clearly established weight of authority from other courts" support Plaintiff's position. *Frasier*, 992 F.3d at 1014. The out-of-circuit cases cited by Plaintiff are distinguishable on similar grounds as *Franks* and *Pierce*—namely,

---

[4] Although not dispositive, the absence of an oath also distinguishes this case from *Snell*, and by extension *Franks*. In *Snell*, we analogized the social workers' fabrications to perjury and claims of judicial deception, as the false, sworn statements were presented to a court to obtain a court order. 920 F.2d at 698 (citing *Myers*, 810 F.2d at 1457). And in *Franks*, the Supreme Court addressed a criminal defendant's right to challenge sworn statements made in an affidavit supporting a search warrant. 438 U.S. at 155–56. In contrast to the fabrications in *Snell* and *Franks*, Defendant's social services report was not submitted for the purposes of obtaining a court order; nor was her report made under oath. *See* Aplt. App., Vol. 1 at 111–12.

18

that they involved officials more closely involved in a *criminal* investigation, who fabricated evidence for the purpose of avoiding or obtaining a *criminal* conviction. *See, e.g.*, *Limone v. Condon*, 372 F.3d 39, 43 (1st Cir. 2004) (denying qualified immunity to a former FBI agent and a former Boston detective alleged to have "framed" the plaintiffs); *Whitlock v. Brueggemann*, 682 F.3d 567, 580–82 (7th Cir. 2012) (denying qualified immunity to a prosecutor alleged to have manufactured evidence while acting in an investigatory role); *Moran v. Clark*, 359 F.3d 1058, 1061 (8th Cir. 2004) (denying qualified immunity to police officers alleged to have "scapegoat[ed] an innocent officer for acts of police brutality").

The majority expends no effort in parsing our case law in this area, but rather concludes the constitutional violation is "obvious." Noteworthy here is the majority's reliance on two cases, both of which involve the fabrication of evidence by law enforcement: *Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2021), addressed a Fourth Amendment claim against a prosecutor for fabrication of evidence; and *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018), addressed a Fourth Amendment claim against five police officers for false arrest. Reliance on these cases elides the distinction made in our case law when Fourth Amendment or Fourteenth Amendment claims are brought against social workers versus when similar claims are brought against law enforcement, including prosecutors. *Supra*, the discussion of *Roska*, at p. 16, footnote 3.

I am not convinced that the unconstitutionality of the alleged fabrication was "obvious," as the majority contends. *See Hope*, 536 U.S. at 738 (denying qualified

19

immunity where Eighth Amendment violation was "obvious"). As the district court observed, "common sense" should have informed Defendant that "a social worker, like any other public official, cannot knowingly create false information in furtherance of an investigation." Aplt. App., Vol. 5 at 1268. Yet, neither common sense nor our prior case law would have informed Defendant that she could not do so for *constitutional* reasons, as opposed to some general, moral reason. And in determining whether Defendant is entitled to qualified immunity, we must look to the constitutionality of Defendant's actions. *See Sheehan*, 575 U.S. at 616 (noting that qualified immunity cannot be overcome merely by showing that an officer's conduct was "imprudent, inappropriate, or even reckless"); *Frasier*, 992 F.3d at 1018 ("[T]he district court was wrong to deny the officers qualified immunity based on their knowledge of [the plaintiff's] purported First Amendment rights that they gained from their training."). I am not condoning the misconduct alleged in this case. Yet I would reverse the district court because the constitutional dimensions of Plaintiff's claim were not clearly established in light of the particular facts presented.

Because I would conclude that the law was not clearly established, I need not address whether Defendant violated Plaintiff's constitutional rights. *See Pearson*, 555 U.S. at 236.

## III

I concur in the denial of Plaintiff's motion to dismiss, and dissent from the denial of qualified immunity.